803 A.2d 123 (2002)
353 N.J. Super. 378
In the Matter of the ADOPTION OF A CHILD BY J.D.S. II and C.S., Plaintiffs/Respondents/Cross-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 2002.
Decided July 23, 2002.
*125 Carol E. Swanson, Woodbury, argued the cause for appellant/cross-respondent M.J. (Larry DeCosta, Executive Director Camden County Regional Legal Services, attorney; Ms. Swanson, of counsel and on the brief).
J.D.S. II and C.S., respondents/cross appellants, argued the cause pro se.
Barbara Barclay Moore argued the cause for the Guardian Ad Litem.
Before Judges SKILLMAN, WALLACE, JR. and WELLS.
*124 The opinion of the court was delivered by WALLACE, JR., J.A.D.
This is an appeal from a judgment terminating defendant Mary James'[1] parental rights to her daughter, Amber, and granting adoption in favor of plaintiffs, Joseph II,[2] the paternal grandfather, and his wife, Cheryl Smith. The Family Part Judge also terminated the parental rights of the biological father, Joseph III, and set and allocated the fee of the Guardian Ad Litem (GAL) among plaintiffs, defendant, and Joseph III.
On appeal, defendant contends the court erred in: (1) denying her fundamental rights as a parent by proceeding with the later-filed adoption complaint, instead of first addressing the earlier-filed custody *126 complaint; (2) applying the wrong legal standard and making factual findings which were not supported by substantial credible evidence; (3) failing to admit into evidence attachments to the Adoption Home Study Report, and limiting her cross-examination regarding those attachments; (4) granting plaintiffs' motion to exclude the other grandparents from participating as objectors at trial; and (5) compelling her to pay a portion of the GAL's fee. In their cross-appeal, plaintiffs contend the court erred in appointing a GAL and in compelling them to pay the majority of the GAL's fee. We affirm the termination of defendant's parental rights, but reverse the award of adoption in favor of plaintiffs and remand for further proceedings. Further, we affirm the appointment of the GAL, reverse the allocation of any portion of the GAL's fee to defendant and remand for redetermination of the amount of the GAL's fee plaintiffs must pay.

I
In 1989, defendant gave birth to her first child, Sarah. That same year, defendant began using heroin, and by 1991, she had developed a $100-a-week heroin habit. She gave legal custody of Sarah to her parents, Cindy and David James.
Defendant began dating Joseph III when she was twenty-one and he was twenty. At the time, Joseph III lived with his mother, Pam Little. He had pled guilty to possession of drugs and had served time in prison.
In June 1992, defendant and Joseph III moved to Florida. Defendant was pregnant with Amber at the time. She claimed she stopped using heroin and cocaine early in her pregnancy. Following the birth of Amber on July 4, 1992, defendant cared for her daughter while Joseph III worked for a construction company.
In 1993, Amber was diagnosed with a lazy eye disorder. A doctor advised corrective surgery, but defendant and Joseph III could not afford the surgery. In April 1995, Dr. Ho informed defendant that Amber's eyes would get worse unless she had the necessary surgery.
Defendant's New Jersey driver's license had previously been suspended for failure to pay traffic fines. At some point, she used a false social security number to obtain a Florida driver's license. Later, defendant's Florida license was also suspended for failure to pay traffic fines. Joseph III also had his driver's license suspended. Nevertheless, both continued to drive.
In 1994, Joseph III was arrested in Florida for possession of cocaine and resisting arrest. He was found guilty and received a probationary sentence. Defendant and Joseph III continued to use drugs. One of their friends, Aubrey Jones, had an extensive criminal history. Aubrey introduced defendant to Valium and Dilaudid, a synthetic form of heroin. Defendant began writing bad checks as a source of money to use to buy drugs. Later, she was arrested and convicted.
On May 24, 1995, shortly before he was to be sentenced to a rehabilitation facility, Joseph III wrote and signed a document relinquishing custody of Amber to Joseph II. Joseph III wrote:
It is my intention that [my father] care for my child while I am in drug rehabilitation. [Amber's] mother is unable to care for her.
Defendant claimed she was not aware of this document. In any event, she continued to care for Amber. In December 1995, defendant left her job due to her drug problem. She began pawning personal and household items to pay for her heroin habit.
*127 Later that month, plaintiffs traveled to Florida to visit with Amber. They noticed that defendant's house was filthy, smelled like cat urine, and there was no food in the refrigerator. Plaintiffs observed that Amber showed signs of developmental delay. In addition, plaintiffs were informed of Amber's need for eye surgery. They immediately arranged for the surgery, which was successfully performed on both of Amber's eyes on December 20, 1995.Plaintiffs were fearful of leaving Amber with defendant and Joseph III. They called defendant's mother, Cindy, who lived about an hour-and-a half away, in Inverness, Florida, but she declined to intervene.
In February 1996, Pam visited Florida because she was concerned about Amber's living arrangements. Defendant told Pam they had been evicted from their home and lived with her friend, Aubrey, for a while. Pam suggested that she and plaintiffs could care for Amber until defendant and Joseph III could get their lives in order. Joseph III agreed to allow Pam and plaintiffs to care for Amber in New Jersey.
On February 17, 1996, Pam received custody of Amber and returned to New Jersey with her. Pam arranged with plaintiffs for Amber to reside with plaintiffs from Sunday evening to Thursday or Friday evening and to reside with Pam on weekends. Plaintiffs and Pam assumed full financial responsibility for Amber.
On February 20, 1996, defendant was arrested for theft and for battery. She was subsequently charged and convicted of shoplifting, battery, resisting a merchant, and unauthorized use of a driver's license. By March 1996, defendant and Joseph III had a heroin habit of $600-a-week.
On May 24, 1996, Joseph III was sentenced to a six-month term in a rehabilitation facility. Defendant then moved in with her mother in Inverness, Florida. She continued to use drugs. On June 26, 1996, defendant entered the QUAD County Methadone Treatment Center, where she tested positive for opiates. She also tested positive for opiates from July 1996 through October 1996.
On August 23, 1996, plaintiffs brought Amber to Florida to visit with defendant and Joseph III, who was still in the rehabilitation center. Defendant tested positive for opiates that same day. After a two week stay, plaintiffs indicated they were ready to leave, but defendant did not want them to take Amber back to New Jersey.
On September 1, 1996, plaintiffs filed a complaint with the Florida authorities. That same day, John Vincelli, of the Department of Children and Families in Florida, investigated and found no evidence that Amber was in danger or should be removed. He noted the house was nice and defendant had an adequate support system.
Meanwhile, plaintiff returned to New Jersey while his wife Cheryl remained in Florida. On September 4, 1996, plaintiff filed an emergency application in New Jersey for temporary custody of Amber, which was granted. The court order was forwarded to Florida. On September 11, 1996, the Florida authorities removed Amber from defendant's mother's home. Defendant was present in the house but hid in the basement to avoid arrest on outstanding warrants. Cheryl returned to New Jersey with Amber.
Plaintiffs immediately sought the assistance of Dr. Robert Waters to counsel Amber in resolving any problems she might have. They also placed Amber in preschool for three half-day sessions per week.
A hearing in plaintiffs' custody action was held on November 6,1996. Defendant *128 did not appear. A Family Part Judge in Gloucester County entered an order granting temporary custody of Amber to plaintiffs and permitting defendant to modify the order on short notice. Defendant made no immediate application to modify the order.
On December 10, 1996, Joseph III was released from the Florida rehabilitation center and returned to New Jersey to visit his mother. He was arrested shortly thereafter for a probation violation resulting from his prior New Jersey conviction. During the Christmas holidays, defendant also came to New Jersey and visited with Amber. Defendant returned to Florida after the holidays.
On January 23, 1997, defendant was arrested for obstructing an officer, fraud, impersonation, and unauthorized use of a driver's license. Defendant entered a drug program in February 1997. She continued to use drugs and refused to undergo the recommended family counseling. Defendant continued to test positive for opiates from February 1997 through August 1997.
Thereafter, defendant's parents, David and Cindy, filed a complaint for custody of Amber in New Jersey. They were granted visitation with Amber, and the court referred the parties to mediation. The court order indicated that the parties agreed that Amber was not to have "any contact with her natural parents without a prior court order."
In June 1997, defendant traveled to New Jersey and filed an application for custody of Amber. It does not appear that she visited with Amber on this occasion, and she returned to Florida a short while later. Defendant continued to test positive for opiates.
In September 1997, defendant filed a motion to intervene in the custody action or to consolidate her complaint with plaintiffs' action. She sought custody of Amber, or in the alternative, visitation. Pam also filed an application for visitation, claiming that plaintiffs prevented her from seeing Amber. On November 14, 1997, the court consolidated all matters, appointed Janet Berson as a therapist for Amber, ordered home evaluations for plaintiffs, defendant, and David and Cindy James, required defendant's counsel to "obtain and provide the court with complete information on defendant's drug use, treatment, and course of treatment," and directed that defendant have no contact with Amber.
In April 1998, defendant was involved in a serious car accident in a vehicle driven by Robert Lentini, her then boyfriend. Several people were killed in the accident. Shortly thereafter, defendant separated from Lentini and moved back with her parents in Inverness.
In a letter report of June 16, 1998, to the court, Berson recommended that defendant and Joseph III have no contact with Amber due to their continued drug abuse, explaining that:
Information received regarding [Amber's] biological parents indicates that [defendant] who is still in Florida was recently in a car accident resulting in several fatalities. The driver is the man she has been involved with who is also on methadone. [Joseph III] ... is currently incarcerated for various probation violations possibly resulting from driving incidents. It is clear that the parents continue to have difficulties and have not managed to get their lives on a more stable course.
The court entered an order on July 1, 1998, continuing the no-contact order between defendant and Amber.
Thereafter, defendant entered the QUAD County drug treatment center.
*129 She continued to test positive for drugs in July 1998. However, by August, she claimed she stopped using heroin and all other illegal drugs, and only used methadone for her treatment.
Also in August 1998, Joseph III filed a motion seeking telephone contact with Amber and supervised visitation upon his release from prison. On September 11, 1998, the court denied Joseph III's request without prejudice, and ordered in part:
Janet Berson in the course of her counseling of [Amber] shall revisit the issue of telephone contact between her father and mother. It is noted that no information has been supplied regarding either parent's drug rehabilitation and [Joseph III] is currently incarcerated. If Dr. Berson submits a recommendation to the court that telephone contact should occur despite the current situation now faced by [Joseph III], and [defendant], then Dr. Berson shall provide the parameters and any necessary restrictions if that telephone contact should occur. The court shall thereafter review the matter at a hearing.
Plaintiffs then filed a complaint for adoption on November 18, 1998. Defendant and Joseph III filed separate answers objecting to adoption. On February 18, 1999, the court consolidated the adoption complaint with the custody visitation cases, extended discovery to April 22, 1999, and directed the Division of Youth and Family Services (Division) to produce for the court's inspection any records pertaining to Amber. Meanwhile, between February and July 1999, defendant incurred six more criminal charges.
On May 28, 1999, the court appointed a GAL for Amber. In July 1999, plaintiffs filed a motion to dismiss the custody applications and for reconsideration of the appointment of the GAL. It does not appear that a hearing on this motion was held.
On September 30, 1999, plaintiffs filed a motion seeking to compel all parties to provide discovery and to schedule a hearing date on their motion. Later, defendant filed a motion for visitation which was denied on December 22,1998.
A management conference was held on January 6, 2000. The court reconsidered the appointment of a GAL and determined that it was in the best interest of Amber to have an independent GAL act on her behalf. However, the court decided to appoint a new GAL, Clyde Walker. The court also vacated the previous order of consolidation, agreed to schedule a final hearing for plaintiffs' adoption complaint after February 1, 2000, and directed that the James' request for modification of custody be deemed an objection to adoption and heard as part of the hearing. The court order also permitted Pam to participate at the hearing, and directed that the issue of sanctions against defendant and Joseph III for failure to provide timely discovery would be decided on the papers.
On April 18, 2000, the court denied the imposition of counsel fees as a sanction against defendant and Joseph III for their failure to provide discovery. The court noted that although the action was made more difficult "in part because of [defendant's] failure to provide information to her counsel and to respond to discovery requests," defendant lacked the financial ability to pay counsel fees. Meanwhile plaintiffs' motion to terminate the GAL was denied.
The adoption trial took place on nineteen days between July and December 2000. On the first day of trial, the court granted plaintiffs' motion to deny the other grandparents standing to participate as objectors. After receiving the testimony of defendant, Joseph III, plaintiffs' expert witnesses, Mala Gupta, M.D., Robert J. Waters, Ph.D., Randi Kell, Ph.D., Sandra Nicodemus, Ph.D., John Vincelli, and Richard *130 Cuirlino, and numerous other fact witnesses, including the grandparents, the trial court reserved decision. The GAL submitted a lengthy report, concluding that it was in Amber's best interest to remain with plaintiffs. The GAL also indicated that because Amber knew her natural parents and cared very much for numerous other members of her family, if the court were to grant the adoption, Amber should have visitation with other family members, including her natural parents if they continued to recover from their drug dependency.
The trial court rendered a written decision on December 21, 2000. With regard to defendant's potential to remedy her problems, the court found that:
Since [defendant] lost physical custody of [Amber] in 1996, she has never had a valid driver's license ... although she has regularly driven a vehicle in violation of the law, and still does. Also since 1996, she has warrants for her arrest for failing to pay fines or appear in municipal courts, a status that continued into this trial with the execution of those warrants in 2000, during this trial. Also since 1996, she has had relapses when she was unsuccessful at a methadone program and was not drug-free, according to her testimony. [Defendant] admitted in testimony to occasionally using drugs "until the last two years." She admits to testing positive for cocaine twice on or about July, 1998.
....
Although [defendant] denies using illicit drugs since 1998, she does admit that in 1999, from February to July, she incurred 6 charges and convictions, including battery, resisting a merchant, giving false information and three counts of fraud.
Further, the court found that: both parents have been causally responsible for their not maintaining any contact with their daughter in the four years that have elapsed since they had her in 1996. Neither has shown an ability to provide a stable life or environment for [Amber]. Neither has been able, up to the time of this trial, to remove the constant danger of their availability to her by enforcement of warrants against them for their arrest, from continual violation of the law, and for a majority of the period, involvement in criminal activity and involvement with others who pose a threat to the "life and limb" of those around them. And neither had demonstrated a removal of the threat of the instability caused by drug abuse. In [Joseph III's] case, the drug use continuing in the course of this trial, in [defendant's] case, continuing substantially after her visitation had been cut off for this, among other, reasons.
The court also considered the Adoption Home Study Report authored by Patricia Sims of the Children's House Society. Sims concluded that she could not "make a recommendation either for or against adoption due to the extent of conflicting information and allegations." Sims reported that plaintiffs had several strengths, but that she had serious concerns about allegations of drug use by Joseph II, that adoption would sever ties between Amber and her extended family, and the adoption was highly contested.
In determining whether to terminate defendant's and Joseph III's parental rights, the court initially applied the standard set forth in N.J.S.A. 9:3-46(a), which is applicable to cases where a child has been placed for adoption. This provision requires a showing that the birth parents have failed, or are unable to perform, the "regular and expected parental functions" of care and support of a child. N.J.S.A. *131 9:3-46(a)(1). In this regard, the court found:
There is no question that up to the time in early 1996, when they relinquished care of [Amber] to her grandmothers, they failed to do so. They failed to maintain shelter for her, losing it because of their drug addiction. They failed to provide needed medical care for her, failing to arrange for needed eye surgery. They failed to provide sources of nourishment for her, having meager food in the house.
Essentially, they failed in the same regard when [Amber] returned to them six months later, just prior to the order depriving them of temporary custody. They were both still addicted to heroin, neither had the means to provide her with food or shelter, and neither was able to maintain a crime free environment for [Amber]. [Defendant] was shoplifting to provide for her habit, with either [Amber] or her other daughter [Sarah] present, and [Sarah] was also occasionally present when [defendant] bought illicit drugs from dealers.
The court concluded that for half of Amber's life, her birth parents "have been unable to render themselves able to maintain communication with Amber, spend time with her, or contribute to her support."
The court also applied the best interest of the child analysis, which is applicable where a child has not been placed for adoption, and which requires that a parent affirmatively assume his or her parental duties. The court found that "[t]he above analysis clearly shows the parents have not done this over the period of Amber's life." The court concluded that plaintiffs established, by clear and convincing evidence, that defendant's and Joseph III's parental rights should be terminated.
Next, the court addressed whether it would be in Amber's best interest to be adopted by plaintiffs. The court found that the three experts presented by plaintiffs had "testified as to the wellness and growth of [Amber]" under plaintiffs' care, and that Amber "appears happy and extremely functional in their household." The court found that:
This testimony was not refuted by the objecting biological parents or their witnesses, except for testimony that [Joseph II] when he was raising [Joseph III] ... fifteen or more years ago, gave [Joseph III] illicit drugs and ingested them himself. Much was made of this testimony, but it was the subject of refuting and rebuttal testimony to the contrary, and was not proved. Moreover, it concerned a period remote in time to the life of [Amber]. Finally, the testimony of the objecting parents themselves was that as far as they know, Amber is doing well under [plaintiffs'] care.
Further, the court noted that the GAL's detailed and extensive report recommended that it was in the best interest of Amber to be adopted by plaintiffs. The court explained that it had chosen to rely on the GAL's report and not interview Amber because the child was unaware of the proceeding, and because of her fragile personality. The court concluded that:
It has been shown by clear and convincing evidence that [Amber] is emerging from a stunting and crippling environment she experienced as a very little girl with the biological parents, and is now blossoming [and] prospering under the care of [plaintiffs]. Eight year old [Amber's] adoption by [plaintiffs] is therefore found by such a standard of evidence to be in her best interest.
With regard to the fees requested by the GAL, the court found that the GAL's request for $27,773 in fees was reasonable, *132 but due to the parties' economic circumstances, he reduced the allowable fee to $20,000. The court then ordered plaintiffs to pay $16,000 of the fee, and ordered defendant and Joseph III to each pay $2,000.
This appeal and cross-appeal followed.

II
We first turn to defendant's arguments concerning her right to have the earlier-filed custody and visitation actions decided before the later-filed adoption complaint, and her alternative argument that the matter should be remanded to provide her with the same protection she would have received if the Division had filed the adoption complaint. Defendant failed to raise these arguments below and we need not address them for the first time on appeal. See R. 1:7-2; R. 2:10-2. Moreover, there is no requirement that complaints be heard in the chronological order they are filed. We have carefully reviewed the record and find no abuse of discretion in the trial court ordering the adoption matter tried first. Further, defendant's request for the appointment of an expert after the court decided this matter adverse to her interest comes too late, and is without merit. R. 2:11-3(e)(1)(E).
We likewise reject defendant's argument that it was error to exclude the other grandparents from participating as objectors at trial. While we harbor some reservations concerning the court's ruling, we note that the other grandparents have not appealed. Moreover, they did testify at trial, and clearly conveyed to the court their respective objections to the adoption by plaintiffs. We are satisfied that, in light of the history of this case and the testimony of the grandparents at trial, any error in excluding them as objectors was harmless. R. 2:10-2.

III
Defendant contends the trial court applied the wrong legal standard and that, in any event, the court's findings were not supported by substantial credible evidence.
We pause to note that cases involving termination of parental rights pose difficult and complex legal questions because the analysis pits preservation of the family against maintenance of a child's physical and emotional needs. Reconciling the two concepts in any particular case is a difficult task. This is one of those troublesome cases.
"A parent's right to enjoy a relationship with his or her child is constitutionally protected." In re Guardianship of K.H.O., 161 N.J. 337, 346, 736 A.2d 1246 (1999). However, parental rights are not absolute and may be impacted by the State's parens patriae responsibility to protect the welfare of a child. Id. at 347, 736 A.2d 1246. "Parents who forsake their children run the risk that others may take their place." In re Adoption of Children by G.P.B., Jr., 161 N.J. 396, 404, 736 A.2d 1277 (1999). Further, these cases are extremely fact sensitive and "require particularized evidence that address the specific circumstances in the given case." K.H.O., supra, 161 N.J. at 348, 736 A.2d 1246.
In reviewing a trial court's findings, we are obliged to accord deference to its credibility determinations and "feel of the case" based upon its opportunity to see and hear the witnesses. State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964). We are not to disturb the trial court's findings unless they are "`so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 *133 (1974)(citing Fagliarone v. Township of N. Bergen, 78 N.J.Super. 154, 155, 188 A.2d 43 (App.Div.1963)). Our Supreme Court has noted that "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare v. Cesare, 154 N.J. 394, 413, 713 A.2d 390 (1998). Although Cesare involved a domestic violence case, the expertise of the family court has equal application in termination of parental rights and adoption matters.
When the child's biological parent or parents resist adoption, the court must first determine whether the parental rights of the parents should be terminated. G.P.B., Jr., supra, 161 N.J. at 404, 736 A.2d 1277. The fact that the child may be better off with an adoptive parent standing alone is not enough to justify termination. Id. at 413, 736 A.2d 1277.
The relevant statute for a private adoption case is N.J.S.A. 9:3-46(a). This statute provides in part:
In a contest between a person who is entitled to notice pursuant to section 9 of P.L.1977, c. 367 (C.9:3-45) objecting to the adoption and the prospective adoptive parent, the standard shall be the best interest of the child. The best interest of a child requires that a parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, the fulfillment of financial obligations for the birth and care of the child, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life.
A judgment of adoption shall be entered over an objection of a person who is entitled to notice pursuant to section 9 of P.L.1977, c. 367 (C.9:3-45) communicated to the court by personal appearance or by letter if the court finds, during the six-month period prior to the placement of the child for adoption or within 120 days after the birth of a child or prior to the date of the preliminary hearing, whichever occurs first, in the case of a child placed for adoption as a newborn infant.
(1) that the parent has substantially failed to perform the regular and expected parental functions of care and support of the child, although able to do so, or
(2) that the parent is unable to perform the regular and expected parental functions of care and support of the child and that the parent's inability to perform those functions is unlikely to change in the immediate future.
In G.P.B., Jr., supra, 161 N.J. at 410, 736 A.2d 1277, the Court reviewed the history of N.J.S.A. 9:3-46 and found that the "parental duties as they relate to the `best interest of the child' under N.J.S.A. 9:3-46(a) differ from the `regular and expected functions' under N.J.S.A. 9:3-46(a)(1) and (2)." The Court noted that the two tests differ in that the specified duties of the birth parents under the best interest analysis "are not as onerous as those required in the performance of `regular and expected parental functions.'" Ibid. Further, the Court explained that in determining what resolution is in the best interest of the child, the trial court must consider whether the objecting parent has affirmatively assumed the duties of a parent and may consider other factors. Id. at 413, 736 A.2d 1277. The Court made it clear that the issue was "whether the biological *134 parent has failed to fulfill his or her duties." Ibid.
Defendant argues that the trial court erred in applying the more onerous requirement of the "regular and expected parental functions" analysis because her daughter was not placed for adoption, but rather, was forcibly removed from her care. She contends the court should have applied the best interest of the child standard.
We agree that the "regular and expected parental functions" analysis was not the appropriate standard because it only applies where the child has been placed for adoption. N.J.S.A. 9:3-38(g) defines placement for adoption as "the transfer of custody of a child to a person for the purpose of adoption by that person." It is undisputed that in February 1990 defendant and Joseph III voluntarily relinquished custody of their daughter to plaintiffs and Pam. However, there was no evidence that defendant or Joseph III placed their daughter with plaintiffs for adoption. In fact, the evidence was overwhelmingly to the contrary. Nevertheless, we find no reversible error in the application of this standard because the trial court also applied the appropriate best interest of the child standard.
In several arguments, defendant contends plaintiffs failed to meet their burden of proof under the best interest of a child standard, and the trial court's findings were not supported by substantial credible evidence.
As noted above, the best interest of the child standard requires the trial court to consider whether a parent has affirmatively assumed the duties of a parent, including whether the parent has: (1) fulfilled financial obligations toward the child; (2) demonstrated continued interest in the child; (3) made a genuine effort to maintain communication with the child; and (4) maintained a place of importance in the child's life. N.J.S.A. 9:3-46(a).
A fair reading of the trial court's opinion reveals that the explicit findings made under the "regular and expected parental functions" standard also satisfied the best interest of a child standard. While it would have been preferable for the trial court to have made more detailed findings of fact, our review of the record satisfies us that the evidence supported the trial court's conclusion under the best interest of the child standard.
First, the financial obligations of a birth parent "are substantially similar under both the best interest standard and the standard for determining whether a parent has performed the regular and expected obligations of parenthood." G.P.B., Jr., supra, 161 N.J. at 411, 736 A.2d 1277; N.J.S.A. 9:3-46(a). In that regard, the trial court found, and it is undisputed, that defendant did not contribute to Amber's support since Amber's removal in August 1996. The fact that defendant was not compelled by court order to contribute to Amber's support does not alleviate her obligation as a parent to do so. Simply put, defendant never sought to provide support to Amber while Amber was in the custody of plaintiffs.
Second, the evidence was clear that defendant failed to establish and maintain a place of importance in Amber's life. Although Amber knew defendant was her birth mother and felt sad about not seeing her, the evidence showed that Amber considered plaintiffs her psychological parents and wanted and expected to remain with them. Defendant made very little effort to see and visit with Amber since August 1996. Thus, defendant has not maintained a place of importance in Amber's life.
The evidence also demonstrated that defendant failed to show a continued interest *135 in Amber and a genuine effort to maintain communication with her. N.J.S.A. 9:3-46(a). Although defendant opposed the adoption and was barred from contacting Amber, as noted above, she failed to make any affirmative efforts to remedy that situation. Defendant did not cease abusing drugs until two years after plaintiffs received custody of Amber, and she failed to comply with court orders compelling her to provide records of her drug treatment, which was a requirement before the court would permit her to communicate with Amber.
In summary, the evidence of defendant's long history of drug addiction, her failure to provide adequate care for Amber due to her addiction, her failure to play more than a minimal role in Amber's life during the four-year period from 1996 to 2000, and Amber's parental bonding with plaintiffs support the trial court's decision that termination of defendant's parental rights would be in the best interest of Amber. We affirm the trial court's termination of defendant's parental rights.

IV
Defendant argues that the trial court erred in finding that it was in Amber's best interest to grant adoption to plaintiffs. Specifically, defendant argues that plaintiffs failed to present expert testimony that adoption was in the best interest of Amber because plaintiffs are causing the entire family to be split apart.
We turn our focus to N.J.S.A. 9:3-48, which provides the procedure for an adoption complaint where the child is not received from an approved agency. This statute requires the trial court to appoint an approved agency to make an investigation and submit a written report to the court, setting forth: (a) the facts and circumstances surrounding the surrender of custody by the child's parents and the placement of the child in the home of the plaintiff, including the identity of any intermediary who participated in the placement of the child;
(b) an evaluation of the child and of the plaintiff and the spouse of the plaintiff if not the child's parent and any other person residing in the prospective home; and
(c) any fees, expenses or costs paid by or on behalf of the adopting parent in connection with the adoption.
[N.J.S.A. 9:3-48 (2)(a),(b) and (c).]
The trial court is required to set a preliminary hearing date within three months from the date the complaint is filed. N.J.S.A. 9:3-48(4). The purpose of the preliminary hearing is to determine the circumstances under which the child was relinquished by his parents and received by plaintiffs, "the status of the parental rights of the parents, the fitness of the child for adoption and the fitness of the plaintiff to adopt and provide for the child." N.J.S.A. 9:3-48b. This statute further provides in pertinent part:
[I]f upon completion of the preliminary hearing the court finds that:
(1) The parents of the child do not have rights as to custody of the child by reason of their rights previously having been terminated by court order; or, the parents' objection has been contravened pursuant to subsection a. of section 10 of P.L.1977, c. 367 (C.9:3-46);
(2) The guardian, if any, should have no further control or authority over the child;
(3) The child is fit for adoption; and
(4) The plaintiff is fit to adopt the child, the court shall: (a) issue an order stating its findings, declaring that no parent or guardian of the child has a right to custody or guardianship of the child; (b) *136 terminate the parental rights of that person, which order shall be a final order; (c) fix a date for final hearing not less than six nor more than nine months from the date of the preliminary hearing; and (d) appoint an approved agency to supervise and evaluate the continuing placement in accordance with subsection d of this section. If the plaintiff is a brother, sister, grandparent, aunt, uncle, birth father, stepparent or foster parent of the child, or if the child has been in the home of the plaintiff for at least two years immediately preceding the commencement of the adoption action, and if the court is satisfied that the best interests of the child would be promoted by the adoption, the court may dispense with this evaluation and final hearing and enter a judgment of adoption immediately upon completion of the preliminary hearing.
[N.J.S.A. 9:3-48C.]
Here, prior to the preliminary hearing, the trial court appointed a GAL for Amber and appointed The Children's House Society of New Jersey (Society) to conduct an investigation and report to the court. In its July 12, 1999 report to the court, in explaining why it could not make a recommendation, the Society listed the strengths and weaknesses of plaintiffs. The Society wrote:
(1) There have been allegations made regarding illegal drug use and prescription use of [Joseph II], both past and present;
(2) Formal adoption of this child would sever ties between the child and her parents and other grandparents.
(3) The adoption is highly contested by all biological relatives of the child to be adopted.
THEREFORE, THIS AGENCY CANNOT MAKE A RECOMMENDATION EITHER FOR OR AGAINST DUE TO THE EXTENT OF CONFLICTING INFORMATION AND ALLEGATIONS IN THIS ADOPTION MATTER.
The GAL, in his seventy-nine page report, concluded it was in Amber's best interest to be adopted by plaintiffs, but cautioned that:
Based on my interview with Amber she very clearly knows who [defendant and Joseph III] are. She is also aware of the identity of, and does care for, various other members of her extended family.
If the Court should choose to grant this adoption, [plaintiffs] will have complete control over whom [Amber] will be permitted to visit. I would recommend to them that they do permit visitation with other members of the family and would go as far as to say that if [Joseph III] and [defendant] continue on the path to rehabilitation that ultimately [Amber] be permitted to visit with them. How and when this visitation would take place would certainly be within the complete discretion of [plaintiffs].
I make this recommendation because I believe that [plaintiffs'] declining to permit visitation and/or communication between [Amber] and the other members of her extended family will cause a strong resentment to grow in [Amber] due to the quashing of her natural curiosity about people who are her blood relatives, if no longer her legal relatives.
Plaintiffs' expert Dr. Gupta, who submitted reports on January 15 and July 1, 1999 in favor of the adoption, failed to address the issue of visitation between Amber and her extended family. Although Dr. Gupta noted that Amber had adjusted well to separation from her half-sister Sarah, Dr. Gupta did not evaluate whether or not it would be in Amber's best interest to maintain *137 a continued relationship with Sarah. However, on cross-examination, she stated that "given the limited amount of information I have, I would probably recommend that she have some contact with her sister." Further, Dr. Gupta failed to address the impact upon Amber if she were to no longer have visitation with her other grandparents. In addition, Dr. Waters recommended that if Amber were going to see Sarah, there should be some type of monitoring.
Despite the concerns expressed by the Society and the GAL, the trial court failed to address these important considerations. Further, the trial court failed to fix a date for a final hearing and to appoint an approved agency to supervise and evaluate the continued placement. See N.J.S.A. 9:3-48(4). While we recognize that because plaintiff is a grandparent, "the court may dispense with this evaluation and final hearing and enter a judgment of adoption immediately upon completion of the preliminary hearing," N.J.S.A. 9:3-48(4), the Society's and the GAL's expressed concerns militated against dispensing with the need for a final hearing.
We note also that in considering whether to grant the adoption, the court stated:
In considering an adoption the court is required, under N.J.S.A. 9:3-48, to obtain an evaluation of the child and the plaintiffs, and except where the agency recommends the adoption (not applicable here; the agency having felt unable to take a position), hold a hearing as to the fitness of the child for adoption, the fitness of the plaintiffs, and again, determine whether ... "the best interests of the child would be promoted by the adoption." N.J.S.A. 9:3-48(e).
We cannot be sure whether the court was addressing the requirement for a preliminary hearing or the requirement for a final hearing. In any event, there was only one hearing. N.J.S.A. 9:3-48(4) clearly implicates a final hearing where the approved agency does not recommend the adoption be granted. Since an approved agency was not appointed subsequent to the preliminary hearing, and since the agency appointed for the preliminary hearing did not make a recommendation in favor of adoption, the trial court should have fixed a date for a final hearing and appointed an approved agency. We conclude the failure to do so was error. A remand is necessary to cure these deficiencies.
At the final hearing, if based upon the approved agency's report and the evidence presented, the trial court is satisfied that the best interests of the child would be promoted by the adoption, the court shall enter a judgment of adoption. However, if the evidence leads the court to conclude that it is not satisfied the best interests of the child would be promoted by the adoption, the court shall deny the adoption and make such further order concerning custody and visitation as "may be deemed proper in the circumstances." N.J.S.A. 9:3-48f.

V
In light of our reversal of the order for adoption we find no need to address defendant's evidentiary argument that the trial court erred in prohibiting counsel from addressing issues raised in the Society's report and in accepting the report without its attachments. The trial court may or may not need to revisit this issue in light of the evidence presented at the final hearing.

VI
Defendant argues that it was error for the court to order her to pay a portion of the GAL's fee because she is indigent. In their cross-appeal, plaintiffs contend that *138 the trial court erred in appointing a GAL and in allocating the GAL's fee primarily to them.
The case of Matter of Adoption of a Child by E.T., 302 N.J.Super. 533, 695 A.2d 734 (App.Div.), certif. denied, 152 N.J. 12, 702 A.2d 351 (1997) is instructive. In E.T., the court appointed a guardian for the child in a contested adoption case. Id. at 536, 695 A.2d 734. After the preliminary hearing, the court entered an order terminating the parental rights of the biological parents and fixed a date for a final hearing for the adoption. The law guardian submitted an application for an award of counsel fees against the adopting plaintiffs. The application was denied. Id. at 537, 695 A.2d 734. On appeal, we affirmed the appointment of a guardian under "the inherent authority of the court, acknowledged by the adoption statute, to take that action in the protection of the child's best interests." Id. at 540, 695 A.2d 734. We cautioned, however, that the appointment "must not be routine but must be reserved for those actions in which the child or the court clearly requires the specific assistance the appointee can render...." Id. at 541, 695 A.2d 734. We noted the order appointing the law guardian expressly authorized the guardian to apply for an award of fees. Id. at 537, 695 A.2d 734. We concluded that where the appointment of a law guardian in an adoption proceeding is appropriate, an award of reasonable counsel fees commensurate with the ability of the plaintiff to pay is also appropriate. Id. at 543, 695 A.2d 734.
R. 5:8B provides that "[i]n all cases in which custody or parenting time/visitation is an issue, a guardian ad litem may be appointed by court order to represent the best interests of the children...." (Emphasis added).
Here, the GAL was initially appointed pursuant to R. 5:8B. This was a highly contentious proceeding with the biological parents residing out-of-state. The GAL provided valuable assistance to the court in these proceedings. Consequently, we find no abuse of discretion in the appointment of the GAL under the inherent authority of the Family Part in an adoption proceeding. See E.T., supra, 302 N.J.Super. at 540, 695 A.2d 734. We affirm the appointment of the GAL substantially for the reasons expressed by Judge Bowen in his written opinion of October 31, 2000.
Defendant and plaintiffs challenge the allocation and the amount of the award of fees. Defendant contends the court erred in allocating any portion of the GAL's fee to her because she is indigent. Plaintiffs argue that they should not have to pay any of the GAL's fee because they too lack the ability to pay, which was not addressed by the court.
R. 5:8B(d) provides that:
[t]he hourly rate to be charged by the guardian ad litem shall be fixed in the initial appointing order and the guardian ad litem shall submit informational monthly statements to the parties. The court shall have the power and discretion to fix a retainer in the appointing order and to allocate final payment of the guardian ad litem fee between the parties. The guardian ad litem shall submit a certification of services at the conclusion of the matter, on notice to the parties, who will thereafter be afforded the right to respond prior to the court fixing the final fee.
Further, N.J.S.A. 9:3-53 provides in part that:
[t]he costs of all proceedings pursuant to... [the Adoption Act] shall be borne by the plaintiff, including the costs incurred by an approved agency acting pursuant to an order of the court; except that the *139 approved agency may waive part or all costs. Payment of costs shall not be a condition precedent to entry of judgment. The costs shall not include the provision of counsel for any person, other than the plaintiff, entitled to the appointment of counsel pursuant to [the Adoption Act].
We noted in E.T., supra, 302 N.J.Super. at 542, 695 A.2d 734, that "ordinarily, prevailing adoptive parents were not intended by [N.J.S.A. 9:3-53] to be insulated from paying the fees of either guardians ad litem or law guardians." We explained that because a GAL is not "counsel" as set forth in N.J.S.A. 9:3-53, the fees are "more properly considered to be costs of the proceedings, which are chargeable to the plaintiff...." Ibid.
Consistent with E.T., we conclude the GAL's fee should have been assessed to plaintiffs as a cost of the proceeding. See N.J.S A. 9:3-53. It was error to assess any of the GAL's fee to defendant. However, we are troubled by the court's failure to comply with the dictates of R. 5:8B(d) to set the hourly rate of the GAL in the appointing order. In light of this deficiency and the asserted inability of plaintiffs to pay the approved GAL's fee of $20,000, we remand for the trial court to reconsider plaintiffs' challenge to the amount of the GAL's fee. We do not imply by this remand that the fee is not appropriate.

VII
This case has been a long, difficult one for the parties. What began as a laudable family effort to assist two troubled young parents has evolved into a contentious adoption proceeding. We wish we could waive a magic wand and return the parties to the amicable relationships that existed among them in February 1996. To be sure, we cannot do that. Perhaps the parties can do that on their own.
We note also that our Supreme Court has recognized that "continued contact between a biological parent and the adopted child, sometimes referred to as `open adoption,' may affect the stability and permanency of the child in his new home." In the Matter of the Guardianship of DMH, 161 N.J. 365, 386, 736 A.2d 1261 (1999). The Court also explained that while open adoption has yet to be approved by the Legislature, the Court has approved of "informal and voluntary agreements for visitation by biological parents provided they are fully counseled, mutually undertaken, and in the best interests of the children involved." Ibid.; see also K.H.O., supra, 161 N.J. at 362-63, 736 A.2d 1246.
In summary, we affirm that portion of the judgment terminating the parental rights of defendant. We reverse that portion of the judgment granting adoption, and remand for the appointment of an approved agency and for a final hearing. Further, we affirm the appointment of the GAL, but reverse the allocation of a portion of the GAL's fee to defendant and remand for redetermination of the amount of the GAL's fee that plaintiffs should pay. We do not retain jurisdiction.
NOTES
[1] The names used in this opinion are fictitious in order to protect the privacy of the parties.
[2] Plaintiff in the singular refers to Joseph II.