# RECORD IMPOUNDED

### NOT FOR PUBLICATION WITHOUT THE
### APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3562-20

IN THE MATTER OF THE
ADOPTION OF A CHILD
BY C.M. AND C.M.

_____

Submitted March 7, 2022 – Decided March 11, 2022

Before Judges Sabatino, Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Salem County, Docket No. FA-19-21.

Masten and Ray, attorneys for appellant R.H. (Michael J. Napuda, on the brief).

Cooper Levenson, PA, attorneys for respondents C.M. and C.M. (Jennifer B. Barr, on the brief).[1]

PER CURIAM

In this contested private adoption matter, appellant R.H. ("Rebecca" or "appellant") seeks reversal of the Family Part's July 20, 2021 order terminating

---

[1] We use initials and pseudonyms for the persons mentioned in this case to protect the identities of the adoptive child and the other minors. R. 1:38-3(d)(16).

her parental rights as to her biological daughter A.H-Q.F. ("Amy"), pursuant to N.J.S.A. 9:3-46(a). The trial court's findings were based on five days of extensive testimony adduced in proceedings at which appellant was represented by court-appointed pro bono counsel.

Appellant opposes the adoption of Amy by her own parents, respondents C.M. and C.M. (collectively referred to by the pseudonym "the Martins"). She fundamentally contends the evidence at trial was insufficient to justify the termination of her rights. Specifically, she contests the court's findings under the statutory criteria within N.J.S.A. 9:3-46(a), concluding that she had not "affirmatively assume[d] the duties encompassed by the role of being a parent" and that termination of her rights is in the child's "best interest." We reject her contentions and affirm.

I.

Rebecca, who was born in 1989, is the adult adopted daughter of the Martins. The Martins adopted Rebecca in 2001 when she was twelve years old. By the time the Martins adopted her, Rebecca had been in and out of several resource homes. She had first been placed in foster care due to her biological mother's drug use and allegations of sexual abuse by her mother's boyfriend.

2

Rebecca has struggled with behavioral issues and depression as far back as she can remember. Her life has sadly only become more erratic since she left the Martins' home in 2007, at eighteen years old. She has a persisting drug addiction, and she has been in and out of jail on drug-related charges and other offenses.

Rebecca has been in relationships with a series of different men, some of whom she has met in her employment. She married T.H. in 2007, moved with him to several different states, and eventually divorced him in 2010. In 2009 she met K.R. at work and started a relationship with him that produced two children, E.M. ("Evan") in March 2010 and Amy in August 2015. Rebecca married K.R. in 2014. K.R. appears to have not been involved in the raising of the two children, and he is not a party to this appeal or an objector to Amy's adoption.

Rebecca continued moving from home to home in various states. She gave birth to Evan in 2010 while living with a boyfriend, J.B., who she left the following year in 2011. Rebecca also gave birth in September 2018 to a third child, Devon, who is in the custody of his biological father, D.A.

In August 2012, Evan, then age two, was reportedly found in the back seat of a car with a stranger who did not know Rebecca or Evan's last names. Evan

3 A-3562-20

was placed temporarily in the custody of the Martins, but then was returned to Rebecca.

In February 2013, Rebecca contacted the Martins and told them she and Evan were living in Philadelphia at a place that lacked heating or electricity. The Martins picked up Evan and he has lived with them since that time. In 2015 the Martins adopted Evan, after Rebecca eventually consented to having her parental rights terminated.

When Amy was born in August 2015, Rebecca was living with T.S., a friend of her biological mother. Two years later in June 2017, Rebecca and Amy moved in with her biological mother's brother, G.C.

In October 2017 Rebecca and G.C. were arrested on incest and drug-related charges. Amy, then two years old, was placed in emergency foster care.

At a hearing in December 2017, the Martins were awarded sole custody of Amy. The child has lived there with her brother Evan, and the Martins' two teenaged biological children, since that time. The court's custody order allowed Rebecca a minimum of once-per-month visits with Amy, on the condition that she keep up with drug and mental health treatment.

Unfortunately, Rebecca continued to have problems with addiction and law-breaking behavior. She did not see Amy for over four months from

December 2017 through April 2018 when the Martins brought Amy for a visit at an in-patient drug facility. She moved back in with T.S. in May 2018, and her visits with Amy became more sporadic after September 2018.

In December 2019 Rebecca abruptly cancelled a planned visit with Amy and the Martins due to alleged car trouble. She did not see Amy in person again through the time of the July 2021 adoption trial, a period of over eighteen months. They only had occasional telephone and video call contact during that time.

In March 2020 Rebecca was convicted in Pennsylvania of a weapons offense and incarcerated in that state. She was released in April 2020 on a COVID-19 furlough, but was re-incarcerated the next month on conspiracy charges.

The Martins filed a complaint to adopt Amy in January 2021. Rebecca opposed the termination of her parental rights. After five days of hearings in July 2021, Judge Michael R. Ostrowksi granted the termination, and this appeal ensued.[2]

---

[2] Consistent with the statute's two-part private adoption process (a termination hearing under N.J.S.A. 9:3-46, followed by an adoption hearing under N.J.S.A. 9:3-48), the adoption apparently has not yet occurred pending this appeal of Rebecca's terminated parental rights.

## II.

### A.

The applicable legal and statutory principles that guide our review are undisputed. We first discuss the substantive ones.

In the absence of a biological parent's consent to surrender parental rights, a court must terminate the parental rights of the biological parent before it can authorize the adoption of a child. In re the Adoption of Children by G.P.B., Jr., 161 N.J. 396, 404 (1999). There are three statutory pathways through which parental rights may be terminated by court order: (1) under Title 30, specifically N.J.S.A. 30:4C-15, by which an action for guardianship is decided in favor of the Division of Child Protection and Permanency; (2) under Title 9, specifically N.J.S.A. 9:2-18, by which a state-approved adoption agency successfully pursues an action for termination; and (3) again under Title 9, specifically N.J.S.A. 9:3-46, by which a possible adoptive parent brings an adoption complaint. Robert A. Fall & Curtis J. Romanowski, Current N.J. Child Custody, Protection & Support ("Child Custody"), § 6:1-3 (2021). This last pathway is the one involved here.

Whether in the Title 30 or Title 9 context, we must and do recognize that the termination of a parent's right to raise his or her child is a matter of

constitutional magnitude. See Santosky v. Kramer, 455 U.S. 745, 753 (1982); see also In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999); In re Adoption of J.E.V., 442 N.J. Super. 472, 481, 487 (App. Div. 2015) (holding that once a private adoption agency proceeds to seek adoption over the objection of a parent, that parent has the right to counsel, as "[a]fter the elimination of the death penalty, [this court] [could] think of no legal consequence of greater magnitude than the termination of parental rights.").

In G.P.B., Jr., our Supreme Court charted the evolution of Title 9 as it bears upon adoption matters. The Court particularly emphasized where certain core concepts included in Title 9 differ from their similarly phrased counterparts under Title 30 in the context of terminating parental rights. G.P.B., Jr., 161 N.J. at 396.

As the Court explained in G.P.B., Jr., N.J.S.A. 9:3-46, up until 1994, "simply stated that the rights of a parent could not be terminated unless the court found that the parent 'failed to perform the regular and expected parental functions of care and support of the child, [including] maintenance of an emotional relationship.'" G.P.B., Jr., 161 N.J. at 405. Since 1994, the Legislature has modified its approach from "favor[ing] the interests of the biological parent . . . to emphasiz[ing] the needs of the child." Ibid. (citing L.

A-3562-20

1993, c. 346, sec. 9 (eff. April 27, 1994)). Under that modified approach, the concept of "affirmatively assum[ing] the duties encompassed by the role of being a parent" has taken on a starkly broader and more elaborate meaning under the Title 9 statute. This baseline concept of parenting goes beyond merely the "maintenance of an emotional relationship" between a parent and a child. Id. at 405-06; 410-12.

As the Court also detailed in G.P.B., Jr., further amendments to the statute in 1998 served "to underscore the significance of the affirmative assumption of parental duties. . . . the amendment reflects decreasing legislative tolerance for biological parents who . . . do not assume the responsibilities of parenthood." Id. at 408 (emphasis added).

The present case, in which Rebecca has not voluntarily placed her child for adoption and objects to the Martins' adoption complaint, is governed by N.J.S.A. 9:3-46(a). The relevant portion of the statute reads as follows:

> a. A person who is entitled to notice pursuant to section 9 of P.L.1977, c. 367 (C.9:3-45)[3] shall have the right to object to the adoption of his child within 20 days after the filing of the complaint for adoption for a State

---

[3] N.J.S.A. 9:3-45, requiring that a "parent" receive notice of a complaint filed in an adoption proceeding under Title 9, defines "parent" as "(1) the husband of the mother of a child born or conceived during the marriage or (2) a putative or alleged biological mother or father of a child." Appellant obviously meets that definition, as her biological parentage of Amy is undisputed.

A-3562-20

resident and 35 days after the filing in the case of a nonresident. Failure to object within that time period constitutes a waiver of the right to object.

In a contest between [a parent] objecting to the adoption and the prospective adoptive parent, the standard shall be the best interest of the child. The best interest of a child requires that a parent affirmatively assume the duties encompassed by the role of being a parent. In determining whether a parent has affirmatively assumed the duties of a parent, the court shall consider, but is not limited to consideration of, [1] the fulfillment of financial obligations for the birth and care of the child, [2] demonstration of continued interest in the child, [3] demonstration of a genuine effort to maintain communication with the child, and [4] demonstration of the establishment and maintenance of a place of importance in the child's life.
…

[N.J.S.A. 9:3-46(a) (emphasis added).]

Importantly, the statute outlines two distinct circumstances in which a biological parent may object to a third party's adoption complaint. Each of them involves a unique evidentiary showing on the part of petitioner before an adoption may proceed. Only the first portion of the statute, quoted above, is relevant to this case. It concerns solely "private" adoptions[4] where the child has

---

[4]  These are at times also referred to as "independent" or "private placement" adoptions in this State's case law and under Title 9.

not been "placed for adoption." Child Custody §§ 6:2-3, 15:2-1 (citing G.P.B., Jr., 161 N.J. at 413).

A "private" adoption describes any scenario in which the child is placed into an adoptive home from a source other than a state-approved adoption agency. Id. at § 6:2-3(a) (citing In re Adoption of Baby T., 308 N.J. Super. 344, 359 (Ch. Div. 1997)). N.J.S.A. 9:3-39.1(a)(3) authorizes such private placements with a child's relatives, including siblings, an aunt, uncle, grandparent, birth father, or stepparent. Ibid. A child has been "placed for adoption" when the parent has transferred custody of the child to a third party for the purpose of adoption. N.J.S.A. 9:3-38(g).

The latter portion of the statute, N.J.S.A. 9:3-46(a)(1) and (2), concerns the second possible circumstance, in which a biological parent has objected to the adoption complaint after having "placed" the child for adoption. Such situations generally arise where the parent has surrendered the child in a non-agency setting, or if the agency surrender is invalid, either of which entitle the parent to notice and an opportunity to object to the adoption. Child Custody § 15:3-1.

When a biological parent has "placed" a child for adoption and later objects to an adoption complaint, the trial court is bound to enter a judgment

over the parent's objection if it finds a "fail[ure] to perform the <u>regular and expected parental functions</u> of care and support of the child" on the objecting parent's part. N.J.S.A. 9:3-46(a)(1) (emphasis added). The relevant findings must be made within a six-month window preceding the placement for adoption. <u>See also</u> <u>In re Adoption of a Child by J.D.S.</u>, 353 N.J. Super. 378, 395-96 (App. Div. 2002) (distinguishing the "best interest" and "regular and expected parental functions" analyses under the statute, finding only the former applied in that case because the objecting parent had not relinquished custody of her child to her in-laws with the purpose of "placing" the child for adoption).[5]

In sum, while not all "placements for adoption" result in "private adoptions" and not all "private adoptions" follow a "placement" by the parent, the salient points relevant to the procedural posture of this case are: (1) that no agency was involved, state-approved or otherwise; and (2) that Rebecca did not "place" her child for adoption. In such situations, a different standard for termination governs.

---

[5] In <u>G.P.B., Jr.</u>, the Court suggested that the "regular and expected parental functions" analysis under N.J.S.A. 9:3-46(a)(1) and (2) holds biological parents up to more "onerous" parental duties than does the "best interest of the child" standard under N.J.S.A. 9:3-46(a). 161 N.J. at 410-11; <u>accord</u> <u>J.D.S.</u>, 353 N.J. Super. at 395.

That standard is denoted in N.J.S.A. 9:3-46(a) as the "best interest of the child" standard. We hasten to acknowledge that this "best interest of the child" standard in the Title 9 context differs significantly from the considerations prompted by the essentially identical phrase under Title 30.

In G.P.B., Jr., the Court commented that although this state's case law had historically "read both statutory schemes [i.e., Title 9 and Title 30] as depending on proof of harm to the child," the Legislature's goals with respect to both have since diverged. G.P.B., Jr., 161 N.J. at 411-12 (citing In re Baby M, 109 N.J. 396, 426 (1988)). Under Title 30, "the 'best interests'[6] test continues to concentrate on whether the parent has harmed or is likely to continue to harm the child . . . harm to the child's safety, health, or development, can lead to the termination of parental rights." Ibid. (internal citations omitted). By contrast, in the present Title 9 context, the Legislature's focus has shifted "from harm to the child to the discharge of parental functions." Id. at 412 (emphasis added).

In keeping with this shift of focus, "Title 9 proceedings are less concerned [with] … harm and more with the parent's willingness and ability to provide effective parenting." Ibid. (emphasis added). Hence, when analyzing the child's

_____

[6] We note the Title 9 statute refers to "best interest" in both the singular and the plural, but that inconsistency has not been viewed to be meaningful. Title 30 refers to "best interests of the child" solely in the plural.

"best interest" under Title 9, the "question is not whether the child would be better off with the adoptive parent, but <u>whether the biological parent has failed to fulfill his or her duties</u>." <u>G.P.B., Jr.</u>, 161 N.J. at 413 (emphasis added).

As expressed in the text of N.J.S.A. 9:3-46(a), the "best interest of the child" requires that the biological parent "affirmatively assume the duties encompassed by the role of being a parent." Unlike the latter portion of the statute not applicable here (which sets a six-month time frame for the court to assess the objecting parent's behavior), no time limit applies to assessing a parent's behavior under the "best interest" standard. <u>In re Adoption of a Child by C.J.</u>, 465 N.J. Super. 162, 174 (App. Div. 2020) (citing <u>G.P.B., Jr.</u>, 161 N.J. at 411).

As we noted above, N.J.S.A. 9:3-46(a) specifies four non-exhaustive criteria to aid the trial court's determination of whether a parent has "affirmatively assume[d]" parental duties. These criteria are:

> (1) the <u>fulfillment of financial obligations</u> for the birth and care of the child;
>
> (2) demonstration of <u>continued interest</u> in the child;
>
> (3) demonstration of a <u>genuine effort to maintain communication</u> with the child; and
>
> (4) demonstration of the establishment and maintenance of a <u>place of importance in the child's life</u>.

13

[N.J.S.A. 9:3-46(a) (emphasis added).]

Though the trial court is free to "consider other factors in determining the child's best interest," G.P.B., Jr., 161 N.J. at 413, it is inappropriate for the court to include considerations applicable to Title 30's distinct "best interest" analysis used in cases brought by the DCPP. See C.J., 465 N.J. Super. at 180. Hence, comparisons between the potential adoptive parents (here, the Martins) and the biological parents (here, Rebecca) are to be avoided. Ibid.; see also Child Custody § 15:2-1.

Our state's case law has further emphasized that the "best interest" standard under N.J.S.A. 9:3-46(a) "does not necessarily favor adoption." See . e.g., J.D.S., 353 N.J. Super. at 398-401 (holding that termination of the objecting parent's parental rights under the N.J.S.A. 9:3-46(a) "best interest" analysis was warranted based on the record, although the trial judge erred in granting the plaintiff grandparents' the adoption without first determining, in accordance with N.J.S.A. 9:3-48, that the adoption would be in the child's best interest).

Lastly, "as a matter of federal constitutional imperative," the evidentiary burden in proving the statutory factors for termination rests on the potential adoptive parent or plaintiff. C.J., 465 N.J. Super. at 178; see also Child Custody § 15:2-4. That burden must be established by clear and convincing evidence.

14

<u>C.J.</u>, 465 N.J. Super. at 178. If a plaintiff has met that threshold and the court has found against the objecting parent, the plaintiff's burden for establishing that adoption of the child would be in the child's best interest eases to a preponderance of the evidence standard. <u>Child Custody</u> § 15:2-4.

B.

In evaluating the trial court's application of these substantive criteria to the facts of this case, we adhere to well-established standards of appellate review. Our review of appeals from orders terminating parental rights is limited. The trial court's factual and credibility determinations are to be accorded significant deference, considering the court's feel for the case based on its opportunity to see and hear the witnesses. <u>C.J.</u>, 465 N.J. Super. at 173 (citing <u>Cesare v. Cesare</u>, 154 N.J. 394, 412 (1998) and <u>J.D.S.</u>, 353 N.J. Super. at 394).

We must not disturb the trial court's findings "unless they are 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" <u>J.D.S.</u>, 353 N.J. Super. at 394 (quoting <u>Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am.</u>, 65 N.J. 474, 484 (1974)). However, a trial court's interpretation of "the law and the consequences that flow from established facts are not entitled to any special

deference." <u>C.J.</u>, 465 N.J. Super. at 173 (quoting <u>State v. Pomianek</u>, 221 N.J. 66, 80 (2015)).

C.

Having considered Rebecca's arguments in light of these standards, and the record as a whole, we affirm the trial court's termination of her parental rights. We do so substantially for the sound reasons set forth in Judge Ostrowski's thoughtful post-trial oral opinion.

1.

In his oral decision, the judge first noted that the Pennsylvania Court of Common Pleas, which issued the December 2017 order granting custody of Amy to the Martins with Rebecca's consent, had found Rebecca "abdicated her parental responsibilities to [the Martins]." The court found that from that date to the present day, the Martins have "engage[d] in all the fundamental conduct and behavior assuming the responsibilities of a parent," and are "solely responsible" for Amy's day-to-day needs and upbringing.

The judge found "by clear and convincing evidence . . . that the [Martins] have predominantly honored their obligations from the Pennsylvania court order[,]" particularly making the "appropriate efforts" to arrange Rebecca's and Amy's monthly visits. Despite those efforts on behalf of the Martins, the judge

16

observed that Rebecca would not "ma[k]e significant strides to try to find a make-up date or find alternative arrangements" following "last-minute cancellation[s]" of several visitation appointments. The judge characterized these relatively intermittent visitations since the December 2017 order as less akin to "mother/child visitation[,]" but rather "more like one would expect with a family friend or a friend." The judge found "nothing here that convinces [him] that these are anything other than mandated, casual events."

Turning to the criterion within the statute, N.J.S.A. 9:3-46(a), the judge concluded that Rebecca lacked "consistent involvement" in Amy's life, aside from the occasional birthday gift or clothes, and a handful of visitations. The judge also noted the lack of any "shred of evidence presented . . . that [Rebecca] has ever filed with this [c]ourt or had any hearings since this order was put into place, asking the [c]ourt to lift restrictions . . . [or] expand parenting time."

Turning to the statutory factor of the "fulfilment of financial obligations" to Amy, N.J.S.A. 9:3-46(a), the judge found that, although they had been met by Rebecca for the first approximately two years of Amy's life, the Martins had handled them since Amy was just over two years old. The judge made clear he was "not specifically comparing the lifestyle that [Amy] is accustomed to, at least financially" between the Martins and Rebecca, but rather considering what

Rebecca has provided "within the context of [her] ability" to support Amy. From that perspective, the court found Rebecca has fallen short for over half of Amy's life.[7]

The remaining three statutory factors were ascribed greater weight and more in-depth analysis by the judge. First, the judge found the absence of a "genuine effort to maintain communication with the child" on Rebecca's behalf. N.J.S.A. 9:3-46(a). In particular, the judge found that Rebecca's "own behavior . . . interfered with some of the contact" between her and Amy, including the criminal violations of which she was convicted. To the extent the Martins thwarted any contact between Amy and Rebecca, the judge was persuaded that the Martins reasonably limited contact when they felt doing so was safer and healthier for Amy.

As to whether Rebecca has maintained "a place of importance" in Amy's life, N.J.S.A. 9:3-46(a), the judge rightly acknowledged that such an assessment involves more than a parent's "subjective intent." The court found the Martins proved "by clear and convincing evidence, an absence of such a demonstration," particularly considering "the minimal efforts . . . by [Rebecca], the failure . . .

_____

[7] We are cognizant, as was the trial judge, of appellant's indigent status and therefore do not hinge our decision on that particular statutory factor as an essential element.

to make application to this [c]ourt perhaps time and time and time again." The judge described Rebecca's efforts underlying this appeal were "too little too late."

Addressing Amy's best interest more broadly, the judge expressed concerns that "[b]y [her] own testimony, [Rebecca] is not ready and may not be ready for at least six months to even have unsupervised overnight parenting time or visitation" with Amy. While that speculative estimate may or may not materialize, Amy's "life continues to hang in the balance." The judge also stressed that "[o]ne of the things that is vitally important to a child is knowing his or her place in life . . . having a sense of permanency, not just perceived."

2.

Following our review of the record, we are satisfied there is ample support for all of these findings made by the trial judge. His decision is also manifestly consistent with the governing law. We need not add more to his thoughtful analysis. Although appellant's life circumstances have undoubtedly been difficult, both as a young child and after she left the Martins' home at the age of eighteen, she has failed to demonstrate a sustained ability and commitment to parent any of her three children, including Amy. We recognize that appellant has made admirable progress in abating her drug and mental health issues, but

19

the judge had ample reason to conclude those recent steps did not negate appellant's long track record of neglect and instability. Respondents met their burden of proof, as shown by the judge's meticulous discussion of the evidence.

To the extent we have not discussed them, all other arguments raised on appeal lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3562-20