# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5268-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.A.,

     Defendant-Appellant/
     Cross-Respondent,

and

E.M.,

     Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.M.
and J.M., Minors,

     Respondents/Cross-Appellants,

and

EZ.M. and A.M.,

Minors.

_____

Argued October 2, 2019 – Decided February 6, 2020

Before Judges Ostrer, Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0028-18.

Lauren Derasmo, Designated Counsel, argued the cause for appellant/cross-respondent (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Lauren Derasmo, on the briefs).

Linda Vele Alexander, Designated Counsel, argued the cause for respondent/cross-appellant J.M. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Linda Vele Alexander, on the brief).

Todd S. Wilson, Designated Counsel, argued the cause for respondent/cross-appellant L.M. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, on the briefs).

Joshua Paul Bohn, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Joshua Paul Bohn, on the brief).

Danielle Ruiz, Designated Counsel, argued the cause for minor A.M. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Danielle Ruiz, on the brief).

Michele Carton Scenna, Designated Counsel, argued the cause for minor Ez.M. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Michele Carton Scenna, on the brief).

PER CURIAM

Defendant A.A.[1] appeals from a final judgment terminating her parental rights to her four children, L.M. (Linda), born in 2003; Ez.M. (Eddie), born in 2004; J.M. (Jill), born in 2006; and A.M. (Alice), born in 2007. The court also entered judgment terminating the parental rights of the children's father E.M. (Earl). Defendant contends the Division of Child Protection and Permanency (the Division) failed to prove the four prongs of the best interests standard, N.J.S.A. 30:4C-15.1(a)(1) to (4), by clear and convincing evidence, and the court failed to make adequate findings of fact and conclusions of law supporting its decision. The Law Guardians for Eddie and Alice urge that we affirm the judgment. The Law Guardians for Linda and Jill argue the judgment should be reversed. Earl did not appeal from the court's termination order and has not participated in this appeal. Having considered defendant's, the Division's, and the Law Guardians' arguments in light of the record and controlling law, we affirm the termination of defendant's parental rights.

---

[1] We use initials and pseudonyms to protect the privacy of the children.

## I.

The evidence presented at the four-day guardianship trial established defendant has a master's degree in biology and holistic health, and in January 2017, she purportedly began an online Ph.D. program in naturopathic medicine. Following defendant's divorce from Earl in 2009 or 2010, she and her three daughters lived with her parents G.A. (Gertrude) and C.A. (Carl), and Eddie resided with Earl.

In 2011, defendant moved with her three daughters to Georgia to seek employment and what defendant characterized as "a better life." Defendant did not find adequate employment in Georgia, was twice evicted from homes she leased, and she requested money for food from Gertrude. Defendant returned to New Jersey with her daughters, and they again resided with her parents.

In August 2014, the Division received an anonymous referral of physical abuse by defendant against Linda. Defendant admitted striking Linda with an open hand as a form of discipline, but the Division determined the referral was unfounded. Defendant, however, agreed to a case plan prohibiting her use of any physical discipline.

Conflicts arose between defendant and her parents over the children and defendant's alleged failure to contribute to the costs of the household. Defendant

A-5268-17T3

agreed to vacate her parent's home in September 2014, but she did not do so. Gertrude obtained a judgment of eviction against defendant in September or October 2014. Defendant then moved again to Georgia with her three daughters, her boyfriend O.H. (Ollie), and his son. She left Eddie in Earl's care in New Jersey. She notified the Division of the move and that she found employment in Georgia. Defendant, Ollie, and the children lived with defendant's friend, with the children sleeping on the floor, but the friend requested they leave. The Division attempted to assess the children's living arrangements, but defendant refused to provide an address because "she did not want the case to follow her."

In December 2014, the Division learned defendant and her three daughters had returned to New Jersey because she could not find employment in Georgia. Defendant reported she was staying with the children in hotels and friends' homes. Gertrude reported that defendant and the children were residing in Ollie's mother's home.

Defendant allowed her three daughters to return to Gertrude's and Carl's home for the balance of the school year "while [defendant got] herself together." Defendant lived elsewhere, and Eddie continued to live with Earl. When the Division contacted defendant on December 4, 2014, she refused to provide the address where she resided.

5

On December 15, 2014, Gertrude reported to the Division defendant and Ollie were involved in a domestic violence incident at Ollie's home, and Ollie used physical force against defendant in front of Eddie. Defendant and Eddie denied the allegations, and defendant reported she exaggerated a report of domestic violence involving Ollie so her parents would let her and her daughters live in their home. The Division investigated the referral concerning the alleged domestic abuse of defendant by Ollie in front of the children and determined it was not established.

On December 17, 2014, the court granted Gertrude and Earl joint legal and residential custody of the three children. The court determined defendant's "[c]ontinued visitation will place the [children] at risk," and suspended defendant's visitation with her three daughters. The court did not bar defendant's visitation with Eddie, who continued to reside with Earl. Earl advised the Division he and defendant agreed defendant's parents could maintain residential custody of the three girls. The court directed that the parties comply with all Division recommendations.

In January 2015, the caseworker reported defendant "is currently homeless and her address is unknown." In May 2015, the caseworker noted defendant "is a transient who is rarely in the children's lives and is court ordered not to have

6

any contact." By September 2015, Gertrude was unaware of defendant's location, and Jill and Alice reported they had not had any recent contact or visits with defendant.

The court entered a September 1, 2015 order granting defendant parenting time with her daughters supervised by Earl during his parenting time. In September, the Division learned defendant was residing with a cousin and at another unknown address. The following month, Gertrude reported to the Division the cousin supervised a visit between defendant and the children. It was also reported that defendant had secured employment as a substitute teacher, and Gertrude was hopeful defendant "might be finally working to turn her life around."

On March 22, 2016, staff at Linda's school made a referral to the Division, claiming Linda reported that Earl abused Eddie during the three girls' weekend visitation at Earl's home. The investigation revealed that Earl had become angry at Eddie and struck Eddie with a brush. Eddie reported Earl had hit him before, including on the previous Christmas when Eddie struck him repeatedly with a cord. The caseworker observed six-and-one-half-inch marks on Eddie's legs that he reported he received during the Christmas incident. The three girls reported that Earl hit them as well, and that they feared him.

A-5268-17T3

On March 24, 2016, the caseworker spoke with defendant, who was at her parent's home, about the referral. Defendant claimed the marks on Eddie's body were birthmarks. The caseworker learned defendant had been living in Philadelphia, but had returned to her parent's home. Gertrude said she intended to ask defendant to leave that day.

The Division substantiated Earl for abuse or neglect of the four children. On March 31, 2016, the court granted the Division's application for temporary custody of the four children, noting defendant and Earl "admitted to hitting their children" and "[t]here has been domestic violence in the home." The court suspended all visitation by both parents pending an evaluation of the children, and it ordered that the Division inform defendant about domestic violence counseling. The caseworker reported defendant and Ollie were homeless at that time. The four children were placed with defendant's parents. At a hearing five weeks later, the court ordered defendant to participate in domestic violence counseling and required in-home counseling for Gertrude and the children.

The caseworker scheduled an in-person meeting with defendant at the Division's office on May 14, 2016, but defendant did not attend, explaining she lacked transportation. Defendant participated in a May 16, 2016 case management review hearing by telephone. The court ordered that defendant

8

comply with the domestic violence counseling services, and prohibited defendant and Earl from discussing with the children the reports from their psychological evaluations when they became available.

A caseworker spoke with defendant on May 23, 2016, and arranged an in-person meeting for May 31. The caseworker offered to either provide defendant transportation to the meeting or to hold the meeting in defendant's home. Defendant declined the offer to meet at her home, did not arrange for the bus passes the Division offered to make available, and did not attend the meeting.

Defendant also did not attend a scheduled June 13, 2016 case management review during which the court ordered supervised visitation of the children by defendant and that the Division provide defendant with bus passes. Defendant did not pick up the bus passes from the Division. She advised the Division she had moved to Long Branch, but would not provide her address, supplying instead only a relative's home as a mailing address.

On June 15, 2016, a Division caseworker reviewed the June 13, 2016 case management order with defendant over the telephone. Defendant was advised bus passes were available for her, and that she was required to meet with the caseworker. Arrangements were made for a June 17 meeting, but defendant did not appear. The caseworker called defendant and left a message advising that

9

the June 13, 2016 order and bus passes would be mailed to her, and that the caseworker would conduct unannounced visits to defendant's home until defendant met the caseworker in person. Eight days later, defendant left a voicemail message for the caseworker advising she no longer lived in Long Branch, but she did not supply a new address.

The caseworker continued her efforts to contact and meet with defendant. On June 27, 2016, the caseworker spoke with defendant on the phone, but defendant refused to provide her address and would provide only a relative's address where her mail could be sent.

On July 6, 2016, defendant informed the Division she moved to Camden, but she did not supply an address. She also indicated she could not afford transportation to meetings with the Division. The Division offered defendant supervised visits at its offices, but defendant failed to appear for the visits scheduled for July 6, July 13, July 21, and August 5, 2016. The Division referred defendant to the YMCA for its supervised visitation program, but defendant declined that service. At a July 20, 2016 case management review, the court ordered that defendant would have supervised visitation with the children once per week at a Division office and required that defendant pick up bus passes from the Division.

A caseworker spoke with defendant on August 4, 2016, reminding defendant it was critical she attend the court hearings. Nonetheless, defendant did not appear for an August 8 case management review hearing where the court continued its prior orders.

The Division approved defendant for visitation supervised by Gertrude beginning on August 12, 2016. Through the end of 2016, defendant attended twelve supervised visits with the children and missed seven other scheduled visits.

In mid-September, defendant advised the caseworker she continued to live in "South Jersey," but she refused to provide her address. The caseworker advised defendant it was essential she attend domestic violence counseling, but defendant asserted the program the Division had referred her did not respond to her calls. The caseworker referred defendant to another counseling service.

Defendant failed to attend two scheduled meetings with the caseworker in November 2016. The Division received an unconfirmed report defendant was residing in Philadelphia, but it did not have defendant's address.

The court completed a three-day fact-finding hearing on December 7, 2016. The court found Earl physically abused the four children through "a pattern of excessive corporal punishment" using various objects.

Defendant first met the Division caseworker in late January 2017, at a family review meeting. Defendant had completed domestic violence counseling by that time. Defendant failed to attend the next scheduled meeting with the caseworker, but she met with the caseworker on February 28, 2017. The caseworker again informed defendant it was important for her to attend Division meetings and court proceedings, and that transportation services were available.

By March 17, 2017, defendant's phone stopped accepting calls from the caseworker. On March 21, defendant informed the caseworker that she was moving to Georgia the following day, and that she had made living arrangements there. She did not provide the caseworker with a Georgia address, but she explained she planned to reunite with her children in Georgia after the school year ended. Defendant returned to New Jersey for a visit in late April 2017, met with the caseworker, and said she had secured a full-time teaching position in Georgia and would arrange for the children to live with her. Defendant lived in Georgia until the beginning of September 2017, and she did not have any visits with the children during the time she resided there.

Defendant participated by phone in a May 12, 2017 permanency hearing. The court found termination of parental rights "appropriate and acceptable," but also found there was a dual goal of reunification. The court determined it was

not safe to return the children to their parents based on Earl's lack of cooperation in parenting counseling and because defendant "lives in Georgia and has not held herself out as a resource." The court cited the Division's provision of services including "psychological evaluation, anger management, therapeutic visitation, [and] referrals for services."

The court directed that the Division file for guardianship within sixty-days and assess defendant's home in Georgia. The court ordered defendant to provide her address to the Division and keep in contact with the caseworkers. The court allowed defendant visitation, including overnights, with a supervisor approved by the Division.

On July 13, 2017, defendant advised the Division her employment in Georgia was part-time, but would become full-time by month's end. She reported having adequate housing — a purported "hold" on a four-bedroom condominium — but she did not have a lease and did not otherwise provide the Division with documentation related to her housing or employment.

On July 19, 2017, the Division filed the guardianship complaint, and, on the same day, the court issued an order requiring defendant and Earl to show cause why the court should not terminate their parental rights. By August 18, defendant had not commenced any full-time employment, and she refused to

provide any paystubs or a lease agreement for her housing. Three weeks later, the Division learned defendant had returned to New Jersey and was living with a friend at an address defendant provided to the caseworker. In a September 14, 2017 order, the court directed that defendant and Earl submit to psychological and bonding evaluations and comply with services; Gertrude and Carl to submit to bonding evaluations; and defendant to continue supervised visitation.

Defendant did not attend a scheduled September 27, 2017 bonding evaluation with Dr. Alan Lee, despite being reminded of the scheduled evaluation and offered transportation to the evaluation by the caseworker. Defendant's bonding evaluation by Dr. Lee was rescheduled for November 9, 2017. During a case management review on October 31, 2017, defendant's counsel advised the court defendant obtained employment as a teacher that precluded her from attending the scheduled bonding evaluation. The court observed schools were closed on November 9 and ordered defendant to attend the evaluation. The court denied defendant's request for monetary assistance for a security deposit because reunification was not within the termination plan. The Division's counsel noted "for several months now . . . [defendant] has made no effort to really do anything that the Division has asked of her, except for the visitation that she does on her own."

A-5268-17T3

Defendant did not attend the November 9 bonding evaluation, and defendant's psychological and bonding evaluations with Dr. Lee were rescheduled for February 27, 2018. During a January 2018 telephone call, defendant refused to schedule a meeting with the caseworker. Defendant met with Dr. Lee on February 27, 2018, for psychological and bonding evaluations.

During the guardianship trial, three caseworkers testified concerning the Division's seven-year involvement with defendant, Earl, and the four children. Gertrude, Linda, and Alice also testified. Dr. Lee, who was qualified without objection as an expert in the field of psychology, also testified. Defendant and Earl did not attend the trial.

Dr. Lee explained defendant has a "fairly limited" grasp of parenting and of the "range of possible ways of proper discipline for a child" between ten and fourteen years old. Defendant admitted to Dr. Lee she had been aware Earl used objects, including a cord, to hit the children, but she made no "specific condemnation of that type of behavior." Defendant expressed hope for reunification, but "she did not have a specific place in mind" or accommodations suitable for the children, although she said she would soon know where she could secure housing.

15

Dr. Lee diagnosed defendant with a "personality disorder, not otherwise specified [(NOS)]," "with narcissistic, avoidant, and paranoid traits or features." He found defendant had some impulsive or immature tendencies and "some rather entrenched and maladaptive personality and character traits," including a significant "coping deficit" that resulted in difficulty with "more complex tasks." He also found defendant appeared "quite self-centered and . . . narcissistic" and focused "heavily on herself and her own views and beliefs," with "an extremely high view of herself." Defendant saw "herself as not having any problems" in need of correction and, relatedly, was skeptical of the professional treatment she has been offered.

According to Dr. Lee, defendant tested high on the "dominance scale," which typifies a "very rigid" personality that, at times, could lead to decision-making consistent with "her strictly held beliefs, which may or may not be accurate." Dr. Lee found defendant tending towards "paranoia and hyper-vigilance," and he noted those traits were consistent with significant "anger and resentment," an inclination to "project blame onto others, and see[ing] oneself as the victim of unjust and unfortunate situations."

Dr. Lee opined that defendant's entrenched traits would likely influence her judgment about the children's needs and lead "her to be rather inconsistent

and unstable in different areas of her life." He explained defendant likely could not offer "the kind of consistency, protection, and support that her children . . . would need at the time, and within the foreseeable future," and she would likely not consent to treatment, given her mistrust and inflated self-image. Dr. Lee testified defendant "does not see the problem in her; she sees the problem in others, and . . . she believes that others are trying to thwart her successes [and], interfere with her unique, special abilities . . . ." He did not recommend defendant's reunification with the children.

Based on the bonding evaluation, Dr. Lee concluded that, although Linda and Jill said they wished to live with defendant, none of the children "had a significant and positive" attachment to her, and that termination of [defendant's] parental rights posed "a low risk [of] . . . severe and enduring harm." Dr. Lee testified each child had a fairly strong bond with Gertrude; Jill, Alice, and Eddie had a fairly strong bond with Carl; and Linda had a "moderately positive attachment" to Carl. Dr. Lee explained that severing the children's relationships with their grandparents would likely inflict severe and lasting harm. Noting the importance of permanency in a healthy childhood, Dr. Lee opined that adoption by Gertrude and Carl would better achieve that goal than kinship legal guardianship.

A-5268-17T3

Gertrude testified that she and Carl sought adoption as opposed to kinship legal guardianship, while insisting on her commitment to preserve the children's bond with their mother, whom she acknowledged they loved. She also offered details of what she perceived as her daughter's lack of stability and poor parenting.

On cross-examination, Gertrude explained she would be unable to allow the children to remain in her home should adoption prove impossible because she was afraid of Earl, whom she claimed had threatened her and Carl in the past. Gertrude confirmed that, if "denied the right to adopt," she would "ask [the] Division to take the children away." She later stated "[i]t would concern [her] greatly" if the children ended up in foster care, but she needed to consider her's and her husband's safety. Although she had not had contact with Earl in at least a year, she feared he would show up at her house. She believes adoption will protect her and Carl from Earl, and the children from Earl's abuse and defendant's irresponsibility. She also testified that although she understood she and Carl would be entitled to receive monetary subsidies as a result of their adoption of the children, they would adopt even if no financial assistance was available.

Linda testified she wished to live with her mother and opposed adoption by her grandparents, but she "would just be fine staying with" Gertrude if defendant could not have custody. Linda testified she had a strong bond with defendant and relied on defendant for help with her homework.

Alice testified that, when she and her sisters briefly stayed in Georgia, defendant "didn't have enough money to take care of [the children] and then [they] had to move back to [her] grandma's house." Alice explained defendant did not live with them because she could not "really tak[e] care of us, for like clothes and stuff and my grandma had to do that, I think."

Alice also explained defendant did not spend "a lot" of time with her, Jill, or Eddie, but instead focused on Linda during defendant's visits with the children. Alice testified she had no time alone with her mother, and she preferred to remain with her grandparents, even if her mother could not join them there. Alice did not want to repeat her experience in Georgia where defendant did not "have enough" and they were forced to move out.

The judge rendered his decision from the bench, finding defendant abandoned her children, left them in the care of her parents, Gertrude and Carl, and never provided the children with a reliable parental figure. The court also found defendant failed to provide the children with a stable environment and, as

19

a result, over many years and for most of the children's lives, defendant's parents solely provided the children with consistent care and a safe and secure home. The court rejected the notion defendant's parents were motivated to care for the children by the potential receipt of monetary benefits, and found Gertrude and Carl "raised, controlled, . . . [and provided] a stable environment" and cared for the children whenever it was necessary. The court noted defendant's parents provided care and support for the children since each was born, and that they did so without any interest in obtaining monetary benefits. The court also found defendant relied on her parents to care for her four children.

The court reasoned that although defendant was educated and a good student, she lacked stability in her life. The court accepted Dr. Lee's testimony that defendant suffers from personality disorders, is unstable, and lacks the ability to care for her children until she achieves stability in her own life. The court further noted that although the children may love defendant and have "some bonds" with her, defendant never functioned as their primary caregiver or was a stable presence in their lives.

The court found no evidence allowing a finding that the children could feel confident defendant would either supply a safe, secure, stable environment or provide for their daily needs. The court noted that defendant "always take[s]

the position" she did not have to provide for the children's needs because her parents were available to do so.

The court cited defendant's consistent instability, explaining that although she claimed to have had great jobs, she did not have an apartment or money to support her children and never demonstrated any ability to care for them. The court also noted defendant actually spent little time with the children, visiting them "once a week, or once every two weeks" for a couple of hours. The court found defendant's actions confirmed Dr. Lee's testimony that defendant suffers from severe personality disorders, is unstable, and is incapable of caring for her children.

The court explained the "[c]hildren are entitled to permanency, security, to know where they're living, who they're living with, [and] where [they] expect to be." The court found Gertrude's and Carl's home "is the only home [the children] really have had that they know to be secure and reliable," and the children's only chance of obtaining permanency is by terminating defendant's parental rights and allowing defendant's parents to adopt them.

Thus, the court found the Division established each of the four prongs of the best interests standard by clear and convincing evidence, and entered an

order terminating defendant's parental rights to the four children. This appeal

followed. Defendant offers the following arguments for our consideration:

[POINT I]

THE APPELLATE DIVISION MUST REVERSE THE JUDGMENT OF GUARDIANSHIP BECAUSE [THE DIVISION] FAILED TO PROVE THAT THE MOTHER'S RELATIONSHIP WITH HER CHILDREN WAS HARMFUL TO THEM NOR THAT TERMINATION OF HER PARENTAL RIGHTS AND ADOPTION BY THE GRANDPARENTS WHO HAD LOST CUSTODY OF THEIR OWN CHILD WOULD SERVE THEIR BEST INTERESTS.

A. A.A. Has Not Harmed Her Children Within The Meaning Of [N.J.S.A.] 30:4C-15.1a(1).

B. The Trial Court's Decision That The Second Prong Of The Statute Was Satisfied Was Not Supported By Substantial, Credible Evidence.

C. The Record Does Not Contain Sufficient Evidence To Support A Finding That [The Division] Met Its Burden Of Proof Under The Third Prong Of The Statute.

1. [The Division] made no effort to reunify mother and children and admitted it failed to even offer services.

2. The trial court did not consider alternatives to termination of A.A.'s parental rights.

D. The Conclusion That Termination Would Not Do More Harm Than Good Was Not Supported By The Evidence.

22 A-5268-17T3

II.

Our review of a trial court order terminating parental rights is limited. N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015) (citing N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012)). "We accord deference to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." F.M., 211 N.J. at 448. This enhanced deference is particularly appropriate where the court's findings are founded upon the credibility of the witnesses' testimony. N.J. Div. of Youth & Family Servs. v. H.B., 375 N.J. Super. 148, 172 (App. Div. 2005) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)).

"Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting G.L., 191 N.J. at 605). However, no

deference is given to the trial court's "interpretation of the law," which we review de novo.  D.W. v. R.W., 212 N.J. 232, 245-46 (2012).

A parent has a constitutionally protected right "to enjoy a relationship with his or her child."  In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999).  That right, however, "is not absolute" and is limited "by the State's parens patriae responsibility to protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent."  F.M., 211 N.J. at 447.  A parent's interest must, at times, yield to the State's obligation to protect children from harm.  N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009).

When terminating parental rights, the court must consider the "best interests of the child."  K.H.O., 161 N.J. at 347.  A petition to terminate parental rights may only be granted if the following four prongs enumerated in N.J.S.A. 30:4C-15.1(a) are established by clear and convincing evidence:

> (1)   The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2)   The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause

serious and enduring emotional or psychological harm to the child;

> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

> (4) Termination of parental rights will not do more harm than good.

> [N.J.S.A. 30:4C-15.1(a)(1)-(4).]

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." N.J. Div. of Youth & Family Servs. v. I.S., 202 N.J. 145, 166-67 (2010) (quoting N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 506-07 (2004)). "[T]he cornerstone of the inquiry [under N.J.S.A. 30:4C-15.1(a)] is not whether the biological parents are fit but whether they can cease causing their child harm." In re Guardianship of J.C., 129 N.J. 1, 10 (1992).

### III.

Prior to addressing defendant's and Linda's and Jill's respective Law Guardian's claim there is insufficient evidence supporting the court's findings as to the four prongs of the best interests standard, we consider the assertion that a

reversal or remand is required because the court failed to make sufficient findings of fact. See R. 1:7-4. To be sure, the court's findings are succinct and generally stated, but we are not convinced the court's findings are inadequate to support its decision. Our careful and thorough review of the evidence and testimony presented during the trial reveals very few disputed facts, and the judge's findings and conclusions are amply supported by the record. See, e.g., In re Adoption of a Child by J.D.S., 353 N.J. Super. 378, 396 (App. Div. 2002) (finding that "[w]hile it would have been preferable for the trial court to have made more detailed findings of fact, our review of the record satisfies us that the evidence supported the trial court's conclusion under the best interest of the child standard").

A.

Defendant and the Law Guardians for Linda and Jill assert that there was insufficient evidence supporting the court's finding the Division presented clear and convincing evidence satisfying the first and second prongs of the best interests standard. Under the first prong, the Division must prove that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). The first prong focuses on the negative effect the parent-child relationship has upon the child's

safety, health, and development. K.H.O., 161 N.J. at 348. The Division is not, however, required to show the child was physically harmed; evidence the child suffered emotional or psychological harm is sufficient. In re Guardianship of K.L.F., 129 N.J. 32, 43-44 (1992).

To satisfy the second prong, the Division must establish "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The court must determine whether the parent has overcome the harms that endanger the child and whether the parent is able to prevent further harm from the parental relationship. K.H.O., 161 N.J. at 348-49.

"While the second prong more directly focuses on conduct that equates with parental unfitness," the first and second prongs "are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of DMH, 161 N.J. 365, 379 (1999). A "[c]ourt need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383.

Here, the evidence clearly and convincingly established defendant's failure to provide her four children with a permanent, safe, and stable home caused the children harm and will delay the permanent placement in a safe and secure home to which the children are entitled. See ibid. (affirming trial court's determination that "a delay in establishing a stable and permanent home will cause harm to" the children). Moreover, the evidence showed defendant's extended and ongoing failure to provide the children with a safe and secure home resulted in "the development of a stronger, 'bonding relationship' to [Gertrude and Carl], the severing of which [will] cause profound harm . . ." to each of the children. N.J. Div. of Youth & Family Servs. v. B.G.S., 291 N.J. Super. 582, 592 (App. Div. 1996); see also N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 507 (2004) (explaining the reunification process should not further delay a child's permanent placement or cause serious harm by severing the bond between the child and a foster family).

Dr. Lee testified there was a significant risk Eddie, Jill, and Alice would suffer from "severe and enduring harm" if their relationship with either Gertrude or Carl was terminated, and Linda would suffer the same harm if her relationship with Gertrude terminated. Dr. Lee did not believe Linda would suffer significant harm if her relationship with Carl terminated. In any event, we are convinced

the evidence supports the court's determination the Division presented clear and convincing evidence of harm to the children and an ongoing risk of harm to satisfy the first prong of the statutory standard.

The evidence similarly supports the court's finding under the second prong, which is established by evidence of "parental dereliction and irresponsibility, such as the parent's continued . . . inability to provide a stable and protective home, [or] withholding of parental attention and care." K.H.O., 161 N.J. at 353. Defendant rightly boasts of her educational accomplishments and of her apparent potential for employment as a teacher or in another professional position, but the evidence shows she is either unwilling or unable to apply her talents and abilities for the benefit of her children.

For at least four years, defendant lived a life of unfulfilled promise and promises, chose not to cooperate with the Division, and failed to provide her children with a safe, secure, and permanent home. Instead, she placed that burden on her parents, Gertrude and Carl, and they unfailingly met the burden. Defendant's actions and failures reflect an "inability to provide a stable and protective home," see K.H.O., 161 N.J. at 353, consistent with Dr. Lee's unrefuted testimony that, despite defendant's intelligence, her pervasive "maladaptive personality and character traits" render her unable to serve "as an

independent caretaker" of her children at the time of trial and in the foreseeable future.  The record lacks any evidence to the contrary.  See N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 616 (1986) (finding lack of evidence parents "would be able to eliminate the potential for harm to their children in the near future" supports a finding the Division satisfied its burden of establishing the second prong of the best interests standard).

## B.

Prong three "contemplates efforts that focus on reunification of the parent with the child." K.H.O., 161 N.J. at 354.  The Division satisfies its burden under the third prong by proving it "made reasonable efforts . . . to help the parent correct the circumstances which led to the child's placement outside the home" and considered alternatives to termination of parental rights.  N.J.S.A. 30:4C-15.1(a)(3).   However, the reasonableness of the Division's efforts is not measured by whether its efforts were successful in bringing about reunification of the parent and child.  DMH, 161 N.J. at 393.

The reasonableness of the Division's efforts turns on the circumstances of the case, but the Division should ordinarily: (1) cooperate with the parent in devising an appropriate plan for services; (2) provide agreed-upon services; (3) keep the parent abreast of the child's progress and health; and (4) facilitate

30

visitation as appropriate.  N.J.S.A. 30:4C-15.1(c); <u>DMH</u>, 161 N.J. at 390. Appropriate services may include "day care, housing assistance . . . parenting classes, [and] financial assistance."  <u>Id.</u> at 390-91.  The services should "foster and maintain the bond between the parent and child" in the hopes of reunification by promoting visitation and by educating the parent in effective caretaking.  <u>Id.</u> at 390.

Defendant claims the Division's "biggest failing in providing reasonable [services] involved visitation."  She argues the children were removed "solely for issues related to" Earl, but thereafter the court required that all of her visitation be supervised.  She also contends the Division did not consider alternatives to termination, such as kinship legal guardianship, and that the Division did not otherwise provide services and admitted to failing to provide reasonable services.

The record does not support defendant's claims, and it establishes the Division provided reasonable services under the circumstances, including transportation services to Division meetings, court appearances, and visitation; therapeutic visitation; domestic violence counseling; supervised visitation; psychological and bonding evaluations; and housing assistance.  The Division also provided the children with therapy; mentorship programs; financial support;

31

and trauma counseling to address their experiences "moving around and being unstable" and witnessing domestic violence.

Defendant argues supervised visitation was unwarranted, but ignores the court required supervised visits until the Division could conduct psychological evaluations to "find out what services are necessary . . . and also determine what's safe for the children as far as visitation." The Division identified "red flags" leading to its request for an evaluation before allowing unsupervised visits, including defendant's refusal to allow the children to continue therapy, and her claim reunification was all the children required. Defendant refused to cooperate with supervised visitation, declined a Division-facilitated supervised visit while she resided in Georgia, and did not participate in the therapeutic visitation the Division made available through the YMCA.

Moreover, defendant attended the arranged visitations inconsistently, and when Gertrude was approved as a visitation supervisor, defendant had "hardly any contact" in person with the children — although she corresponded through phone calls or text messages — because she "didn't think she needed to be supervised by or have therapeutic visits." Even after defendant and Gertrude began scheduling visits at her home without the Division's involvement, defendant did not visit as often as she could — about three times a week — even

though she could have visited daily. The Division limited visitation to twice per week after Gertrude reported defendant would fail to notify her in advance of a visit, or would arrive early or late to a visit, and, following that change, Gertrude reported defendant missed several weeks of visitation entirely.

Defendant's resistance to the Division's efforts to obtain an evaluation which delayed her opportunity for unsupervised visits; her inconsistent attendance at the visitations that were arranged; and her months-long absence from New Jersey during which she had no visitation with the children undermine her assertion the Division failed to provide reasonable visitation services. Preserving a parent's rights ceases to be "reasonable" when, among other factors, the parent refuses services. A.W., 103 N.J. at 610 (citation omitted).

The Division also considered alternatives to termination, including kinship legal guardianship. See id. at 609; P.P., 180 N.J. at 512. However, a ready and willing relative is a prerequisite for that option. A.W., 103 N.J. at 609.

Gertrude testified she and Carl sought to adopt the children and, if that adoption was not available, they would no longer care for the children. Thus, kinship legal guardianship was not an available option. The court did not credit Gertrude's testimony, and defendant argues the court erred in its credibility

finding, but we defer to the court's determination, which it supported with detailed findings. See G.L., 191 N.J. at 605; E.P., 196 N.J. at 104. Further, where, as here, "the permanency provided by adoption is available, kinship legal guardianship cannot be used as a defense to termination of parental rights." P.P., 180 N.J. at 512-13 (citing N.J.S.A. 30:4C-15.1(a)(3)).

Defendant argues she "was ready to take her children at the time of trial," but that, "even assuming she was not, there is no reason why the family could not continue as they had . . . with the children remaining in the grandparents' custody without termination of parental rights." That option was rejected for reasons supported by the record. As noted, continuing the status quo would prolong the children's harm by delaying the permanency to which they are entitled. In addition, defendant opted not to appear at trial and thereby offered no testimony or evidence she either is willing or able to exercise physical custody of the children, provide them with a safe and secure home, and actually care for them. And the record evidence otherwise clearly and convincingly establishes she is not.

The Division acknowledged it offered domestic violence counseling for the first time in January 2017, but defendant refused those services and opted to obtain the counseling, which she completed, on her own. The Division also

34

informed defendant she could not regain custody of her children until she had adequate housing. Defendant, however, never requested housing assistance and always assured the Division "she was working on getting herself housing, employment." The Division requested paystubs confirming her employment and the lease for property she said she rented in Georgia, but defendant never provided the requested information.

In October 2017, after spending months in Georgia, defendant reported she obtained a teaching position in Newark. The caseworker requested defendant's paystubs, but defendant did not produce them until May 2018, just prior to the commencement of the guardianship trial. A caseworker explained the requested information was required before the Division could provide housing assistance, but defendant refused to provide the information. The evidence further established that, despite the Division's repeated offers to meet with her in person, defendant consistently failed to attend meetings, maintain regular contact with case workers, and keep the Division informed of her current address and contact information.

Defendant contends the Division "offered [her] absolutely no roadmap to follow in which to regain her children," but the Division's provision of services here was necessarily limited by defendant's recalcitrance, lack of cooperation,

unavailability, and consistent resistance. Thus, the record supports the court's determination the Division provided reasonable services under the circumstances presented and sustained its burden under the third prong of the best interests standard.

C.

Under the fourth prong of the best interests standard, the Division must present clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4); see also K.H.O., 161 N.J. at 355. The Division need not prove an absence of harm — termination is inherently damaging — but it must demonstrate that termination will help at least as much as it hurts the child. K.H.O., 161 N.J. at 355. The court must "balance the relationship of [] the [biological] parent and the child, and determine whether the child will suffer greater harm from terminating the child's ties with" his or her biological parent than from permanent disruption of the child's relationship with a resource parent. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 435 (App. Div. 2001).

Although the fourth prong is centered broadly on "harm," its principal focus is the harm of impermanence. A.W., 103 N.J. at 610. Termination ought lead to "a permanent resolution of the child's status," and a child's relationship

with a parent should not be severed without "a more promising relationship . . . [in] [his or her] future." Ibid. (citation omitted) (first alteration in original). By terminating a parent's rights, the State implicitly promises the child a permanent home. Id. at 611. The risk of that promise going unfulfilled may outweigh the harm a child suffers by remaining with a parent. Ibid.

Where, as here, putative adoptive parents are already involved, the fourth prong requires proof that remaining in the resource home will provide the children with greater stability, without countervailing harm, than the parent. K.H.O., 161 N.J. at 355. "Weighing the potential harm that terminating [the child's] relationship with her mother against that which might come from removing her from her foster home is painfully difficult, but it is a decision that necessarily requires expert inquiry specifically directed to the strength of each relationship." Ibid. (quoting J.C., 129 N.J. at 25). Such expert opinion should follow a "full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007) (quoting J.C., 129 N.J. at 19).

Here, the Division presented ample and unrefuted evidence that termination of defendant's parental rights will not do more harm than good.

Gertrude and Carl are able and caring resource parents, and they have provided the children with the only consistently stable and secure home they have known. Dr. Lee found strong bonds between the children and Gertrude, and between Jill, Alice, and Eddie and Carl, and he determined severing those bonds would likely cause the children serious and lasting harm. By contrast, Dr. Lee found that none of the children enjoys a similarly strong bond with defendant, and that each child enjoys only a neutral bond with her. Thus, Dr. Lee reasoned termination of defendant's parental rights entailed a low risk of "severe and enduring harm." He also opined that the children's best prospect for achieving permanency was adoption by Gertrude and Carl.[2] Defendant and the children offered no expert opinion or other evidence refuting Dr. Lee's testimony.

We reject any claim that Gertrude and Carl are motivated by an interest in the monetary stipends provided by the Division for their care of the children. The Division originally became involved with the family in response to a claim of physical abuse, and the court granted joint custody to the grandparents and Earl in 2014 following allegations of violence involving defendant's boyfriend.

---

[2] In her reply brief, defendant asserts that following trial, Linda was "thrown out" of the grandparents' house and is living in a "shelter." We do not consider the claim because it is unsupported by any competent record evidence, and there was no motion to supplement the record on appeal. See R. 2:6-2.

The grandparents gained full custody of the children after it emerged that Earl physically abused the children. The record is simply bereft of any evidence Gertrude and Carl, who have provided consistent care and a safe and secure home to the children for many years, are motivated by anything other than the best interests of the children and their desire to provide the permanent home defendant has demonstrated she is either incapable or unwilling to provide to her children.

We have considered that Linda and Jill prefer not to be adopted by their grandparents, but their preferences do not outweigh the court's well-founded determination that termination of defendant's parental rights are in their best interests. We appreciate that they would prefer a situation where their mother provides the safe, secure, and permanent home to which they are entitled, but the record sadly shows defendant is either unwilling or unable to do so, and that their grandparents have, and continue, to provide the only realistic opportunity for permanency. As a result, their preferences do not outweigh the clear and convincing evidence establishing that termination of defendant's parental rights is in each child's best interests.

D.

We last address Alice's request for continued "contact with [defendant] after termination." She relies on In re D.C., 203 N.J. 545, 551 (2010), which held that an adoptive parent has no absolute "parental autonomy" to cause harm to the adopted child by preventing visitation by the child's biological family members. An adopted child retains the right to visits by his or her natural parents. N.J.S.A. 9:6B-4(e). Moreover, the court may grant a grandparent's or sibling's application to visit an adopted child upon proof that visitation would serve the child's best interests, based on several enumerated factors. N.J.S.A. 9:2-7.1(a)-(b). See Moriarty v. Bradt, 177 N.J. 84 (2003) (addressing the standard grandparents must meet under N.J.S.A. 9:2-7.1 so as not to infringe on parents' fundamental right to raise their children as they see fit).

Gertrude testified she intends to allow defendant contact with the children because she wants to work with defendant as "a team." Acknowledging "the children love their mother" and "want her involved in their life," Gertrude testified she aimed "to support that relationship and do whatever it takes to keep [t]he children in the best quality of life possible with their mother very present." In any event, Alice's claimed interest in visitation with her mother following termination of defendant's parental rights is not an issue before us on this appeal.

We therefore do not address the merits of the claim other than to note any such request must be made to the Family Part in the first instance.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5268-17T3