# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2495-20

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.M.D.,

      Defendant-Appellant,

and

E.D.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF C.R.M.,
Jr. III, a minor.

_____

      Argued February 7, 2022 – Decided March 18, 2022

      Before Judges Accurso, Rose and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0022-20.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Adrienne Kalosieh, of counsel and on the briefs).

Wesley Hanna, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Wesley Hanna, on the brief).

Todd Wilson, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd Wilson, on the brief).

PER CURIAM

Defendant S.M.D. appeals from a final judgment terminating her parental rights to the youngest of her six children, C.R.M., Jr. III, whom we refer to as Chris.[1]  Chris is nine-and-a-half years old and has been in foster care for eight-and-a-half years.  S.M.D. contends the Division of Child Protection and Permanency failed to prove even one of the four prongs of the best interests standard of N.J.S.A. 30:4C-15.1(a)(1)-(4) by clear and

---

[1]  This name is fictitious to protect the child's identity.  See R. 1:38-3(d)(12). Chris's father's rights were also terminated in this action.  He has not appealed.

convincing evidence, and the judge "failed to draw a legal conclusion on the evidence" regarding the State's obligation to explore alternatives to termination. Chris's law guardian joins with the Division in urging we affirm the judgment. Having considered defendant's arguments in light of the record and controlling law, we affirm the termination of her parental rights to Chris.

Defendant's history with the Division goes back fifteen years to when she turned to it for help in 2006, having given birth to her second child with no place for them to live. Although the Division assisted with referrals to parent support and housing programs, homelessness continued to dog defendant as did her mental health problems. By 2010, she'd had two more children and been diagnosed with depression and schizophrenia. She was living in a motel, suffering a high-risk pregnancy with her fifth child and had stopped taking her medication. Near the end of 2010, defendant moved with her children into an apartment and the Division arranged for in-home counseling by a licensed clinical social worker, the same one she has intermittently continued to treat with since, and purchased food and clothing for the children.

By the end of 2011, however, the Division received multiple reports that defendant was neglecting her children, including from defendant's mother, who claimed defendant no longer wanted her children, physically abused them and

3

sold her food stamps instead of buying food to feed them. Defendant struggled to feed and house her family, relying on food banks, friends and public assistance. In 2012, her five-year-old son, Chris's older brother, was seriously injured when he was struck by a car when the family was crossing a street. The boy was walking slightly ahead of the rest of the family, next to his father, when the light changed. While the rest of the family remained on the median, defendant told the boy, who was in the roadway, to run to the other side. He did so and was struck by an SUV, suffering a broken arm, fractured pelvis and a laceration to his liver.

In 2013, the Division removed five of the children, including eleven-month-old Chris, after defendant posted a plea for help on her Facebook page about killing them and herself, and North Brunswick police responded to her request for assistance as she walked along Route One pushing four of the children in a shopping cart. Defendant's oldest daughter was with defendant's mother in Ohio, and her oldest son, the one injured in the accident, was with his paternal grandmother.

In the months that followed, defendant did not attend treatment provided for her at Rutgers University Behavioral Health Care, rarely visited the children and was difficult to contact. Although over the next few years, the

4

Division's plan changed from reunification to termination and back, and two prior guardianship complaints were dismissed, defendant never regained custody of the children. The oldest lives with defendant's mother in Ohio, where defendant was living prior to trial, two others are in kinship legal guardianships with resource parents and paternal relatives, defendant made a voluntary identified surrender of one child to the child's resource parents and the court transferred custody of another to paternal relatives.

Psychological evaluations conducted in 2019 and 2020 by Dr. Barry Katz echoed those conducted years earlier in noting defendant's prior diagnoses of depression, schizophrenia and mood disorder. Defendant reported she'd associated with "bad people" after the children were removed, lived with a pimp and prostituted herself. Testing revealed defendant suffered from anxiety, mania, domineering rigidity, impaired interpersonal relationships and a high level of paranoia. Dr. Katz testified those traits had affected defendant's functioning, robbing her of the ability to hold down a job, maintain relationships and achieve stable housing. He also saw those traits reflected in the record of visitations, where defendant was often reported "to be very appropriate, punctuated by significant incidents of her acting out towards the children in a very inappropriate and at times dramatic way."

A-2495-20

Defendant denied any prior mental health problems to Dr. Katz, claiming she'd been misdiagnosed. Although admitting she had "lived on the streets" at various times, and had previously acknowledged exposing the children to drug use and violence, defendant denied any problems with her parenting. She claimed the children always "had a roof over their heads," even during those periods when she left them in the care of others. She maintained that any problems the children experienced were the fault of the Division.

Dr. Katz testified defendant's "inappropriate, emotional abusive behaviors towards the children," including angry outbursts and excessive and unusual physical discipline, such as making them stand in a corner with their arms extended, occurred at the same time she was involved, and reportedly making good progress, in treatment. Dr. Katz explained that meant "this level of problem is not something that's impacting" defendant "as a symptom might traditionally do," but was instead "an ingrained part of [defendant's] personality structure." He explained the behaviors have "existed for many years" and persisted "even with interventions" and the "removal of the children . . . through the current evaluation."

Dr. Katz further testified defendant's harm to Chris continued even after his removal in her failure to visit him consistently and her sometimes

6

inappropriate behavior when she did visit, reflected in the absence of any secure bond between them. After reviewing defendant's long history with the Division and the stubborn persistence of her mental health problems and inability to achieve stable housing for herself and her children, Dr. Katz concluded there was no sign of defendant making "any significant change at this time or in the foreseeable future."

Chris unfortunately had a few different placements during the long pendency of this matter before going to live with a family that wanted to adopt him. Upon his removal in 2013, Chris and one of his sisters were placed in a non-relative resource home and then in the home of a family friend. The Division removed both children from that placement over concerns about the friend's then boyfriend. In 2014, Chris was placed in a non-adoptive resource home while the Division explored other family members for placement, including his maternal grandmother in Ohio. Chris's resource parents told the Division they loved the boy, but at their age did not want to adopt another child. They were, however, willing to care for him as long as he required placement.

In early 2016, Chris, then four-and-a-half, was seriously misbehaving at his daycare and his resource parents reported problems at home as well. Chris

7

also started to isolate himself and play alone during sibling visits. The Division explored other placements, including the family friend who cared for him in 2013. She, however, declined although she took in one of his sisters, and Chris continued in his non-adoptive resource home.

By mid-2017, Chris had been permanently expelled from daycare. His resource parents enrolled him in a summer camp program, but he was expelled from it as well after he bit a counselor. The Division referred Chris for play services and a partial hospitalization program. In August 2017, the Division moved Chris to respite care while his resource parents went away on vacation. Although Chris had been with his resource parents for three years at that point, and had to be consoled and reassured about the temporary move, he immediately made friends with his respite hosts' daughter. By the end of his stay, the respite hosts told the Division they wanted to adopt him.

The Division began transitioning Chris to his new pre-adoptive home in November 2017. By the following February, Chris was successfully discharged from his partial hospitalization program. He moved into his new home in March and returned to public school with an Individualized Education Plan and Behavioral Assistant. Chris's case manager visited him at his new home and noted he "appeared to be a totally different kid," very well behaved

8

and happy. His new resource parents reported he was "usually like this all the time; that he keeps himself busy with books and toys and they [had] no issues getting him to listen."

At about the same time the Division began transitioning Chris to his pre-adoptive home, defendant suggested her second cousin, a New Jersey lawyer, as a possible caretaker for some of the children. Defendant's cousin advised she had only recently become aware of defendant's involvement with the Division, and although she could not take all of the children, she was willing to provide resource care or adopt "whatever child/children needs her the most." She didn't have a current relationship with any of the children and had never met Chis.

The cousin was twenty-eight with a five-year-old son and going through a divorce. She revealed she had been engaged in an intensive outpatient program two months before for a "deep depression" occasioned by the divorce but had been treated, discharged on no medication and was currently stable. She said she worked fifty to sixty hours a week at a large law firm, but could see herself looking for a position that required fewer hours in order to make the children her priority.

The Division immediately began the process of assessing defendant's cousin and discussing visits between her and Chris and one of his sisters. In early January, however, the cousin advised that a woman friend, with an open case with the Division, would be moving in with her. The Division asked for some background information on the friend and sent defendant's cousin an email to confirm she was committed to adopting the children and could be available for Chris's weekly therapy session and twice weekly therapeutic visits so she could "start developing a relationship with the children."

The Division's plan at that point was to transition Chris to defendant's cousin. Chris's resource parents reported he knew he could not stay permanently with his resource family but was unhappy and confused by the transition. They reported he was having nightmares and tantrums, and they worried he was going from being a happy little boy to a troubled child. They asked he be moved out of their home and placed in the pre-adoptive home he'd been visiting either until he would go to defendant's cousin or until the pre-adoptive family would be able to adopt him if that ended up being the Division's goal. The resource mother said she and her husband were hoping to continue to be connected to Chris if his future family would allow but felt his

10

"being in just one home that [could] eventually become his forever home might help in ceasing all the anger and confusion he [was] experiencing."

The Division sought advice from Chris's partial hospitalization provider about the advisability of a concurrent transition plan to Chris's pre-adoptive non-relative resource home and "whether ongoing contact with [that family] would pose an issue or be an additional support to the child & [defendant's cousin] so that he doesn't have to experience another loss."  When the Division followed up its email to defendant's cousin about her availability with a phone call, she advised she had already told them she could only visit on the weekends and would only be available by phone for Chris's weekly therapy session, and thus saw no need to confirm it in an email.  She also advised she was not then willing to "mak[e] any changes to her schedule [because] she might have to do it in the future once the children arrive to her home."

The plan to transition Chris to defendant's cousin fell apart in March 2018.  Defendant had some weeks before begun bringing her eldest daughter, then almost fifteen, to visits with the children.  That child had been living with her grandmother and defendant in Ohio, and the caseworker believed she was simply visiting her mother.  In mid-March, however, the Division received a referral reporting the child was living there with defendant and engaging in

risky and inappropriate behavior. The Division began an immediate search for her. In the early morning hours of the following day, police informed the Division that defendant had brought the child to the hospital reporting she had been raped.

The Division found defendant and the child at the home of defendant's cousin many hours later. The Division learned the child had moved to New Jersey more than three weeks before and was not enrolled in school. The child advised she'd been raped by a family friend two weeks earlier. Defendant claimed she only learned of the rape the day before from the mother of one of the child's friends.

Defendant's cousin informed the Division that she'd known of defendant's plan to bring the child to New Jersey for about a month. She claimed she'd proposed the child live with her, as she thought it unlikely the Division would permit the child to live with defendant, given defendant did not have custody of her other five children. She also reported defendant had given her a letter transferring custody of the child to her and that they would be going to court to obtain an order formalizing the arrangement.

After consulting with a supervisor, Division workers effected an immediate removal of the child, which the court approved a few days later,

12

granting the Division custody. Another order entered the same day directed the Division to immediately assess any potential caregivers identified by defendant, including a specifically named family friend as well as defendant's cousin, with the court indicating that were defendant's cousin to offer proof that she was stable in mental health treatment and remained interested in caring for defendant's oldest child, the court would consider placing the child with her.

Defendant's cousin, however, had by that time advised she was no longer interested in assuming custody of that child or any of defendant's children. The cousin wrote a letter to the Division objecting to the removal of defendant's eldest child and its refusal to permit that child to remain with her "[f]or reasons [she] [could] not begin to grasp." She noted she had "asked repeatedly for opportunities to meet with the children in the evenings and on weekends in order to reconcile [her] demanding work schedule with the need to build a relationship with the children," and expressed the view that "the Division ha[d] gone out of its way to push [her] out of the picture."

Defendant's cousin further expressed her view that "[d]espite every effort [she'd] made, the Division ha[d] continually treated [her] like [she was] an unfit parent working to get her kids back rather than a concerned relative

13

attempting to help her little cousins achieve the care they've too long been denied." She advised "[i]n light of the Division's handling of this case" that she was withdrawing herself from consideration as a placement for any of the children. She closed her letter saying, "[s]hould your approach to the matter change at some time in the future, you all know how to reach me; but, until then, I ask that you do not." The Division sent defendant's cousin a "rule out" letter, which she did not appeal, acknowledging her unwillingness to provide a home for the children due to her concerns with the Division, and that she had withdrawn her resource application and removed herself from the home study licensing process. Defendant's cousin testified to those events at trial.

Dr. Katz testified about the bonding evaluations he conducted with defendant and Chris as well as with Chris and his resource parents. He testified Chris, seven-years-old at the time of the doctor's 2019 evaluation, recognized defendant as his mother and had some emotional attachment to her but did not rely on her as a parental or nurturing figure, which Dr. Katz attributed to Chris having not been in her care since he was a year old, defendant's inconsistency in visiting him during the ensuing years and her sometimes inappropriate behavior when she did visit. Comparing the 2019 bonding evaluation he conducted of Chris and his mother with the one he

14

conducted approximately a year later, Dr. Katz noted "it was more dramatic" in the second evaluation "how [Chris] was not emotionally expressive towards [his mother]."

In contrast to what Dr. Katz deemed was the insecure and harmful attachment Chris had to his mother, the psychologist described Chris's "bond and attachment toward his current resource parents [as] the only stable functional relationship he has experienced in his life." Dr. Katz offered the opinion that Chris continued to suffer from his insecure attachment to defendant, and that terminating her parental rights would not cause him any appreciable harm. Dr. Katz further opined that Chris needed permanency and that his best, and possibly only chance at stability and for developing a reasonably well-adjusted life, would be with the resource parents who wished to adopt him. Dr. Katz concluded that, in his view, removing Chris from his resource parents would cause the boy severe and enduring harm.[2]

---

[2] After the conclusion of this trial, N.J.S.A. 30:4C-15.1(a)(2) was amended to delete the former second sentence of the subsection, thus excluding from consideration evidence of harm to a child caused by removal from his resource parents. L. 2021, c. 154. Defendant has not argued for retroactive application of the statute. Accordingly, we do not address it. But see James v. N.J. Mfrs. Ins. Co., 216 N.J. 552, 563 (2014) (noting "[s]ettled rules of statutory construction favor prospective rather than retroactive application of new legislation"); see also In re Guardianship of B.L.A., 332 N.J. Super. 392, 400

In addition to offering the testimony of her cousin and a treating therapist, who had been working with defendant for nine months in Ohio and testified there had been improvement in her treatment goals of minimizing the effects of depression and working to achieve stable housing, defendant testified on her own behalf. She claimed she was living temporarily in New Jersey, but believed she could find permanent housing within a month if she returned to Ohio. She acknowledged, however, that she was not working and had no income. She also acknowledged not visiting with Chris regularly, but claimed the fault lay with the Division, which failed to accommodate her. She testified Chris was the only one of her six children with whom she was not permitted a relationship "because of the Division." Significantly, however, defendant admitted she was not ready to assume custody of Chris. Her plan was to place Chris with her cousin while she returned to Ohio to secure a job and appropriate housing.

Finally, defendant presented the brief in camera testimony of eight-year-old Chris. He testified he would feel "sad" but "okay" if he could not see his

(Ch. Div. 2000) (considering retroactive application of statutes in the context of child protective services litigation).

mother or siblings in the future. He testified similarly with regard to the prospect of being separated from his resource family.

After hearing eight days of testimony over the course of two months, the judge put a lengthy opinion on the record concluding the Division had carried its burden of clear and convincing proof on all four prongs of the best interests test. After summarizing the testimony of the witnesses and putting his credibility findings on the record, the judge had no hesitation in finding defendant had endangered Chris's health, safety and development "by her many years of mental health issues, including depression, many years of lack of suitable employment, and many years of lack of appropriate housing which led to the removal of all six of her children, including [Chris] in 2013." The judge noted defendant had no means of supporting Chris financially and after seven years of "continuous treatment and support," still had no home for him.

As to the second prong, the parent's unwillingness or inability to eliminate the harm, the judge found "no question" but that defendant "still suffers from the same mental health issues," albeit to a lesser extent, she suffered when the litigation began seven years before. The judge found defendant's "failure to achieve stability in mental health, housing and employment after many years of treatment and services by the Division" has

17

interfered with Chris's ability to achieve stability, leaving him "in a state of flux without any clear path to [the] permanency" he deserves.

The judge found the Division "made every reasonable effort to provide [defendant] with services necessary to correct the reasons for [Chris's] removal" and bring her to the point where she could safely parent the boy. The judge chronicled the myriad efforts the Division made to provide defendant the necessary counseling to deal with her mental health issues, which defendant minimized at trial despite ample evidence to the contrary, and the ways it had supported her efforts to find employment and achieve stable housing, including funding her move to Ohio where she maintained she had greater family support.

Although acknowledging the requirement of N.J.S.A. 30:4C-15.1(a)(3) that the court "consider[] alternatives to termination of parental rights," and thoroughly reviewing the testimony of the case workers who catalogued Chris's placements and the Division's efforts to place the boy with relatives or family friends, as well as defendant's cousin's testimony about her dealings with the Division and one-time willingness to provide a home for some of defendant's children, including Chris, the court, inexplicably, failed to state it had considered alternatives to termination. Instead, the court merely found the

18

Division proved "all of the elements of the third prong by clear and convincing evidence."

Finally, the judge concluded, based on the unrebutted expert testimony, that termination of defendant's parental rights would not do more harm than good. The judge accepted Dr. Katz's testimony that defendant was not then fit to parent Chris, and that additional time had not and would not change that. The judge concluded defendant was "absolutely not capable of resuming her parental responsibilities for the foreseeable future," and that continuing Chris "in limbo" would deprive him of the security and stability of a permanent home with his resource parents.

Our review of a trial court's decision to terminate parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448-49 (2012). We generally "defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 293 (2007)). As our Supreme Court has reminded in respect of termination of parental rights, "a trial court's factual findings 'should

19

not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

Our review of this record convinces us the judge's findings are amply supported by the trial testimony and the many records of the Division's interaction with this family admitted in evidence. Defendant contends reversal is required as a matter of law because the court "failed to draw a legal conclusion on the evidence regarding the second subpart of prong three, the State's requirement to explore alternatives to termination." In addition, she claims the Division's evidence did not establish: the parental relationship caused Chris harm; defendant was unwilling or unable to eliminate the harm given her continued participation in services; the Division assisted defendant with housing, her primary barrier to reunification, or family planning for reunification; and that severance of the parental bond would not do more harm than good.

With the exception of the argument about the court's failure to consider alternatives to termination, defendant's arguments reduce to quarrels with the judge's fact-finding we are simply in no position to reject. See F.M., 211 N.J. at 448-49 (explaining "[i]t is not our place to second-guess or substitute our

judgment for that of the family court," when "the record contains substantial and credible evidence to support the decision to terminate parental rights"). They accordingly require no extended discussion here.

Chris had been in placement for over seven years at the time of trial. The law is well established that "[a] parent's withdrawal of that solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child," In re Guardianship of D.M.H., 161 N.J. 365, 379 (1999), and this record amply supports the court's finding it was true here.

Moreover, the judge accepted the unrebutted expert opinion that defendant suffers from intractable psychological problems that prevent her from regulating her emotions, resulting in frequent angry outbursts at the children.[3] Dr. Katz's opinions represent only the most recent reports of defendant's largely untreated mental health problems. There are at least five other reports and evaluations from experts and service providers in this record documenting years of the same. While defendant cites her continued participation in mental health services, the record reveals her participation was

_____

[3] Although defendant underwent a psychological evaluation and bonding evaluation with her own expert, Gerald Figurelli, no report was offered in evidence, and the expert did not testify at trial.

21

marked by the same inconstancy that characterized all of her efforts to provide a safe and stable home for her children — and a marked unwillingness to acknowledge her mental health problems. The judge accepted Dr. Katz's testimony that defendant may well be sincere in reporting she has benefited from the many years of treatment in that she feels her own symptoms less acutely, but it has not improved her ability to care for Chris.

While we acknowledge the error in the judge's failure to explicitly state he considered alternatives to termination, we find no basis to reverse the judgment on that basis given the utter lack of evidence of alternatives in the record. There is, to be sure, a statutory preference for the temporary placement of children with suitable relatives pending the ultimate determination of the children's future. N.J.S.A. 30:4C-12.1(a). Although it has long been the Division's goal "to place, whenever possible, children with relatives," N.J. Div. of Youth & Family Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002), there has been "no presumption in favor of placement with relatives."[4] N.J. Div. of Youth and Family Servs. v. K.L.W., 419 N.J.

---

[4] After the conclusion of this trial, the Governor signed legislation declaring "[k]inship care is the preferred resource for children who must be removed from their birth parents because use of kinship care maintains children's connections with their families." L. 2021, c. 154, § 1 (L. 2021, c. 154, § 1 has

Super. 568, 580 (App. Div. 2011). "[U]ltimately the question is what was in [the child's] best interest based upon the circumstances as they existed at the time of the final hearing." N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 527 (App. Div. 2003).

There is no dispute that the Division assessed and ruled out a number of defendant's relatives and friends as a potential placement for Chris — including defendant's cousin. Although her decision to withdraw herself as a placement for him based on her dissatisfaction with the Division's removal of his sibling from her home was unfortunate, the trial court plainly did not find it impugned the Division's good faith efforts to consider alternatives to termination.

Although we, like the trial court, have no reason to doubt the truthfulness of defendant's cousin's testimony or the sincerity of her feelings, she acknowledged the Division's inability to discuss the details of the case left

---

been reproduced in the editor's note to N.J.S.A. 30:4C-84). Defendant does not argue for retroactive application of this statute as she maintains N.J.S.A. 30:4C-12.1(a) and existing case law, see N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 86-87 (App. Div. 2013); K.L.W., 419 N.J. Super. at 580-83, already express the State's clear preference that children requiring out-of-home-placement be cared for by relatives. As with the post-trial amendments to N.J.S.A. 30:4C-15.1(a)(2), because defendant does not argue for retroactive application, we do not consider it.

her to speculate about its motives. She testified, for instance, that she believed the Division wasn't serious about placing Chris with her when she learned the Division had moved him to the family who had undertaken his respite care, and they were attending his treatment team meetings. Yet our record reveals his prior resource family's concern that their unwillingness to provide Chris a permanent home was contributing to the little boy's insecurity and behavioral problems, and that the Division consulted with his partial hospitalization program as to the advisability of moving Chris in response to their concerns and, specifically, "whether ongoing contact with [the new family] would pose an issue or be an additional support to the child & [defendant's cousin] so that he doesn't have to experience another loss."

Critically, however, defendant's cousin did not offer herself as a placement when she testified at trial, and defendant did not suggest another alternative. Simply put, there was no evidence of any viable alternative to termination of defendant's parental rights to Chris at the time of trial. While it certainly would have been preferable for the trial court to have clearly made that finding on the record, see In re Adoption of a child by J.D.S., 353 N.J. Super. 378, 396 (App. Div. 2002), the absence of any viable alternative gives us no cause to reverse on that ground.

24

Justice O'Hern explained in A.W. that there are no victors in a guardianship case and that "given the need for continuity, the child's sense of time, and the limits of our ability to make long-term predictions, [the best interests of the child] are more realistically expressed as the least harmful or least detrimental alternative." N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 616 (1986) (quoting Solnit, Psychological Dimensions in Child Placement Conflicts, 12 N.Y.U. Rev. L. & Soc. Change 495, 499 (1983-84)). We have no doubt that defendant loves Chris and she has long fought to maintain her relationship with him, but we are also satisfied the evidence supports the trial court's finding that her intractable emotional issues render her unable to safely parent him now or in the foreseeable future despite many years of services, and that his need for permanency and the promise of a secure and stable home make clear termination of parental rights is in Chris's best interests in accordance with N.J.S.A. 30:4C-15.1(a)(1)-(4).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2495-20